# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

NOLA VENTURES, LLC ET AL

VERSUS

UPSHAW INSURANCE AGENCY, INC. ET AL

CIVIL ACTION

CASE NO. 12-1026

SECTION: G(2)

## ORDER

This litigation involves an insurance dispute arising out of a May 2011 tornado in Joplin, Missouri that destroyed two Arby's restaurants owned and/or operated by NOLA Ventures LLC, NOLA Restaurant Group LLC, and Critical Mass Holdings LLC (collectively, "Plaintiffs"). Plaintiffs allege that Defendants Upshaw Insurance Agency, Inc. ("Upshaw") and Upshaw agent Robert Bentley ("Bentley") (collectively, "Defendants") negligently misrepresented the coverage under the insurance policy that Upshaw procured for them. Before the Court is Defendants' "Motion for Summary Judgment on Liability,"[1] wherein Defendants seek dismissal of all claims brought against them by Plaintiffs.

## I. Background

### A. *Factual Background*[2]

NOLA Ventures, LLC ("NOLA Ventures") is an "Arby's Roast Beef" restaurant franchisee. Critical Mass Holdings, LLC ("CMH") is the owner of the buildings from which some NOLA

---

[1] Rec. Doc. 71.

[2] Based on the Parties' briefs, and how Plaintiffs chose to address Defendants' list of undisputed facts, the Court is unable to discern which facts are disputed and which are not. The following is the Court's best attempt to identify the undisputed facts in this case.

Ventures restaurants operate. NOLA Restaurant Group, LLC ("NOLA Restaurant") manages the NOLA Ventures restaurants.[3]

In September 2006, Plaintiffs purchased fourteen Arby's restaurants from Specialty Food Systems, Inc. ("Specialty"), including the two Joplin properties at issue here.[4] In March 2007, Plaintiffs engaged Defendants as the retail insurance broker for the Joplin properties.[5] Bentley served as Plaintiffs' insurance representative.[6] Bentley had acquired property insurance for the Joplin properties when they were owned by Specialty.[7]

On March 21, 2011, Bentley visited Plaintiffs' Metairie, Louisiana office to discuss Plaintiffs' insurance policy options for the ensuing year.[8] At the meeting, Bentley presented Scott Bastion, Darrell Ashley, and P. Albert Bienvenu, IV with three options for insurance programs for the 2011-2012 insurance year.[9] Plaintiffs selected the Lexington policy as the primary layer of insurance and the Axis policy as the excess layer of insurance.[10] Bentley agreed to procure those

---

[3]  Rec. Doc. 1–1 at p. 1–2.

[4]  Rec. Doc. 98 at p. 2.

[5]  Rec. Doc. 1–1 at p. 2.

[6]  *Id.* at p. 2.

[7]  Rec. Doc. 71–3 at 2.

[8]  Rec. Doc. 1–1 at p. 2.

[9]  *Id.* at p. 2-3; *see also* Rec. Doc. 98-4, deposition transcript of Christopher Scott Bastion (herinafter "Bastion deposition"); deposition transcript of Darrel K. Ashley (hereinafter "Ashley deposition"); deposition transcript of P. Albert Bienvenu, IV (herinafter "Bienvenu deposition").

[10]  Rec. Doc. 71–24.

policies immediately.[11] On March 28, 2011, Defendants presented Plaintiffs with the insurance application signature pages.[12] Scott Bastion signed and returned the documents.[13]

On May 22, 2011, a severe thunderstorm and tornado destroyed the two Joplin properties.[14] Plaintiffs believed the Lexington policy covered up to $10 million of damage.[15] During the claims process, Plaintiffs were told that the Lexington policy would only pay "actual cash value" unless and until the restaurants were rebuilt.[16] Plaintiffs were also informed that the Axis policy contains a "Broad Windstorm and Hail Exclusion" that did not provide coverage for the windstorm losses suffered by Plaintiffs.[17] Plaintiffs recovered $1.9 million for the two Joplin properties under the Lexington policy.[18]

On June 24, 2011, Bentley delivered copies of the Lexington policy to Plaintiffs' Metairie, Louisiana office.[19]

### B.    *Procedural Background*

On April 23, 2012, Plaintiffs filed suit in 24th JDC, Jefferson Parish, for damages "which resulted from the defendants' negligence, misrepresentation, want of care, fault and breach of

---

[11]   Rec. Doc. 1–1 at p. 3.

[12]   *Id.* at p. 3.

[13]   Rec. Doc. 98 at p. 8.

[14]   Rec. Doc. 1–1 at p. 4.

[15]   *Id.* at p. 4.

[16]   *Id.* at p. 5.

[17]   *Id.* at p. 5.

[18]   Rec. Doc. 71–3 at p. 12.

[19]   Rec. Doc. 1–1 at p. 3.

fiduciary duty."[20] Defendants removed to this Court, alleging diversity jurisdiction.[21] Defendants filed the pending motion on September 9, 2013.[22] On September 24, 2013, Plaintiffs filed a memorandum in opposition.[23] Defendants filed a reply memorandum in support of the motion on September 25, 2013.[24] On March 11, 2014, Upshaw filed a supplemental memorandum in support of the motion,[25] and Plaintiffs filed a sur-reply memorandum in opposition on March 21, 2014.[26]

## II. Parties' Arguments

### A.    *Defendants' Arguments in Support*

Defendants argue that they are entitled to judgment as a matter of law on liability because Louisiana law does not impose on insurance agents a duty to advise insureds as to the proper amount or type of coverage.[27] Defendants argue that in *Isodore Newman Sch. v. J. Everett Eaves, Inc.*,

> [t]he Louisiana Supreme Court noted that 'the insured is responsible for communicating his insurance needs'; [sic] and 'an agent has no duty to independently assess the needs of the insured and recommend coverage,' and the agent has no duty to advise a client it is underinsured. Further, the Supreme Court discussed that it is 'the client's responsibility or duty, not the agent, to determine the amount of coverage needed.'[28]

---

[20] *Id.*

[21] Rec. Doc. 1.

[22] Rec. Doc. 71.

[23] Rec. Doc. 98.

[24] Rec. Doc. 115.

[25] Rec. Doc. 221.

[26] Rec. Doc. 228.

[27] Rec. Doc. 71–3 at p. 13 (citing *Parker v. Lexington Ins. Co.*, No. 06-4156, 2006 WL 3328041 (E.D. La. Nov. 15, 2006); *Dobson v. Allstate Ins. Co.*, 2006 WL 2078423 (E.D. La. July 21, 2006)).

[28] *Id.* (citing *Isidore Newman Sch. v. J. Everett Eaves, Inc.*, 2009-2161 (La. 7/6/10), 42 So. 3d 352) (emphasis omitted)).

According to Defendants, "Louisiana law does not place a duty on insurance agents to insure homes for more than their clients represent they are worth based on the notion that the insurance agent should have known that the owners undervalued their own property."[29] Defendants argue that no duty is breached if the agent procures insurance for the full amount of a building value as approved by the insured.[30]

Defendants next contend that this Court must apply the three-part test set forth in *Parker v. Lexington Insurance Company* to determine whether Plaintiffs may recover for losses resulting from the failure of an insurance agent to procure the desired coverage.[31] Under the *Parker* test, as characterized by Defendants, Plaintiff must prove each of the following elements: (1) an undertaking or agreement by the insurance agent to procure insurance; (2) failure of the agent to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly if he has failed to obtain the insurance; and (3) action by the agent warranting the client's assumption that the client was properly insured.[32] Defendants argue that "[P]laintiffs cannot prove all three elements of the *Parker* test." Specifically,

> [P]laintiffs do not even allege that Upshaw failed to use reasonable diligence in attempting to place the insurance and failed to notify them promptly that it failed to obtain the insurance, which is the second element. Here, it is undisputed that Upshaw diligently procured insurance in the amount of the scheduled values of the buildings. Indeed, the schedule contained in the Upshaw proposal is attached to the Lexington policy.[33]

---

[29] *Id.* at p. 15 (citing *Rowland v. State Farm Fire & Cas. Co.*, 2007 WL 3231665 (W.D. La. Oct. 30, 2007) (emphasis omitted)).

[30] *Id.* at p. 16.

[31] *Id.* at p. 12 (citing *Parker v. Lexington Ins. Co.*, No. 06-4156, 2006 WL 3328041 (E.D. La. Nov. 15, 2006)).

[32] *Id.*

[33] *Id.* at p. 17.

Apparently addressing the third element of the *Parker* test, Defendants argue that Plaintiffs were "put on express written notice that each location had a rebuilding value and a total insured value"[34] because "Upshaw sent a schedule of values to [Plaintiffs] on April 29, 2011, a month before the tornado. This schedule not only showed the rebuilding limits per restaurant, and not only showed the total insured value per location, but it also showed the amount of premium based on each location's total insured value."[35]

Defendants additionally argue that Plaintiffs should have known the details of the policy at issue and that "an insured like [plaintiff] who does not inquire about a particular coverage, who does not ask for the coverage, who does not ask for clarification about the coverage, and never examined the years of policies, has no right to assume that he is covered and then sue his agent because his [the insured's] assumption was incorrect."[36] According to Defendants, "[e]ven an alleged statement to an insured that it is 'fully covered' fails to state a claim where a 'simple review' of the policy (or here, the schedules) would have put the insured 'on notice' of the coverage they were receiving."[37]

Defendants make several alternative arguments based on Louisiana statutory law and contract law. First, Defendants argue that Plaintiffs have already received the full amount allowed under "Louisiana Valued Policy Law," which "mandates that in the case of a total loss the insurer shall compensate the insured at the value used to determine the premium."[38] Accordingly,

---

[34] *Id.* at p. 24 (emphasis omitted).

[35] *Id.* (emphasis omitted).

[36] *Id.* at p. 14 (citing *Mandina, Inc. v. O'Brien*, 2013-0085 (La. App. 4 Cir. 7/31/13) *writ denied*, 2013-2104 (La. 11/22/13), 126 So. 3d 485 (emphasis omitted)).

[37] *Id.*

[38] *Id.* at p. 17–19 (citing La. Rev. Stat. Ann. § 22:1318; *Chauvin v. State Farm Fire & Cas. Co.*, 495 F.3d 232 (5th Cir. 2007)).

Defendants argue, "because there was a total loss, the Louisiana Valued Policy Law statute mandates that the insured should receive the scheduled value as compensation under the policy."[39]

Next, Defendants aver that Plaintiffs "grossly failed to comply with the valuation provision" of the policy, which

> expressly requires the insured to provide a statement of values which consist of the current 100% property and time element values for all insured locations...The property values shall be shown on a replacement cost bases...Receipt of said statement of values by this company shall be considered as authorization by the insured for premiums under this policy to be calculated.[40]

Defendants contend that Plaintiffs "submitted values that were worth only half of the actual value. They paid premiums based on those values, but now they want to recover twice the scheduled value."[41] According to Defendants, "the [P]laintiffs have claimed that the values of the two buildings were under-reported in an amount of $992,208.68."[42]

Defendants next claim that Plaintiffs signed the insurance contract, and are therefore bound by the contents of the contract. Defendants acknowledge that it only sent the signature pages for the insurance application to Plaintiffs, but argue that "the law is absolute that by signing the application signature page[,] the insureds are bound by the contents of the insurance application."[43] Defendants

---

[39] *Id.* at p. 19.

[40] *Id.* (ellipses in original).

[41] *Id.* at p. 20.

[42] *Id.* at p. 19.

[43] *Id.* at p. 20 (citing *Arthur J. Gallagher & Company v. Babcock*, 2011 U.S. Dist. LEXIS 2514 (E.D. La. Jan. 10, 2011); *Mt. Cavalry Baptist Church v. Williams Construction Company of Port Allen*, 2006-1674 (La. App. 1st Cir. 2007); *Aguillard v. Auction Management Corp.*, 04-2804 (La. 6/29/05), 908 So.2d 1; *Tweedel v. Brasseaux*, 433 So.2d 133, 137 (La. 1993)).

additionally argue that the insurance proposal presented by Bentley to Plaintiffs at the March 2011 meeting is not controlling because "[P]laintiffs did not sign the insurance proposal, and...Louisiana law provides that the signed application is controlling."[44] Moreover, according to Defendants, the proposal contains a disclaimer that it is a summary only, and "is subject to all policy terms, conditions and exclusions," which would "necessarily include the terms and conditions that the most it would ever pay for any occurrence was the scheduled limits and total insured values for each location."[45]

Finally, Defendants contend that

[i]t is contrary to Louisiana contract law for plaintiffs to submit rebuilding costs (and here, undervalue rebuilding costs by approximately 50%), pay a premium they knew was based on those values, and now contend they are entitled to insurance worth double those values. Under Louisiana contract law, they paid the 'price' for the 'thing' (insurance with a premium based on rebuilding values they represented to the insurer) and to allow them to recover any additional amounts under the policy would be unreasonable and contrary to Louisiana contract law.[46]

## B. *Plaintiffs' Argument in Opposition*

In opposition to Defendants' motion, Plaintiffs assert that the Louisiana Supreme Court expressly preserved the separate duty of an agent to use reasonable diligence in advising a client, and that Defendants breached that duty by (1) misrepresenting the Lexington policy and (2) failing to advise Plaintiffs with reasonable diligence as to the correct amount and type of coverage after "having held itself out as an expert in such matters."[47]

---

[44] *Id.* at p. 22.

[45] *Id.* at p. 22.

[46] *Id.* at p. 25.

[47] Rec. Doc. 98 at p. 13-14, 16 (citing *Newman* at 359).

With respect to the Lexington policy, Plaintiffs assert that "the standard of reasonable diligence includes explaining the policy accurately and clearly communicating its terms, especially its limitations and exclusions."[48] Plaintiffs point to cases which, they contend, apply either a negative duty not to mislead a client regarding a policy value[49] or an affirmative duty to clearly communicate limitations or exclusions on coverage.[50] Plaintiffs allege "that they were misled by Upshaw's material misrepresentations of the policies" and that "Plaintiffs were told here that they purchased a different type of policy than in years past, which is evidenced by Bentley's admitted explanation of the policy and confirmed by his email assuring that the $10M primary is plenty to cover the Joplin issue."[51]

With respect to the duty owed by an insurance agent to an insured, Plaintiffs acknowledge that "[t]ypically, an insurance agent has no duty to advise its clients as to the correct amount or type of insurance to best fit their needs."[52] However, Plaintiffs contend that "[a]n insurance agent's duty can be greater than merely procuring the insurance requested, depending on what services the agent holds himself out as performing and the nature of the specific relationship and agreements between the agent and his client."[53] Plaintiffs argue that "a duty arose when Upshaw unilaterally undertook

---

[48] *Id.* at p. 17.

[49] *Id.* (citing *Aurillo v. Gressaffa*, 405 So.2d 664 (La. App. 4 Cir. 1981)).

[50] *Id.* at p. 18 (citing *Sims v. Insurance Unlimited of West Monroe*, No. 28234, (La. App. 2 Cir. 2/28/96), 669 So.2d 709).

[51] *Id.* at p. 14.

[52] *Id.* at p. 18.

[53] *Id.* at p. 18 (citing *Belmont Commons, L.L.C. v. Axis Surplus Ins. Co.*, 569 F. Supp. 2d 637, 644 (E.D. La. 2008)).

to advise Plaintiffs with regard to the correct type and amount of insurance. This duty was breached when Bentley recommended a policy to Plaintiffs that he clearly did not understand."[54]

Plaintiffs concede that in order to prove that Defendants breached a duty to procure with reasonable diligence the insurance requested, Plaintiffs must satisfy the three-pronged *Parker* test.[55] With respect to the first element, Plaintiffs contend that Upshaw undertook to procure insurance for Plaintiffs, as demonstrated by (1) a letter agreement between Upshaw and NOLA Ventures "in which Upshaw memorializes its intent to act as an insurance agent for the plaintiffs and (2) the Lexington policy that Defendants procured.[56] Plaintiffs argue that the second *Parker* element is satisfied because (1) Defendants misrepresented the terms of the policy presented at the March 2011 meeting; (2) Plaintiffs "specifically requested [Defendants] bind the Lexington policy;" (3) Defendants "failed to procure the insurance coverage agreed upon by the parties;" and (4) Defendants did not notify Plaintiffs "that it failed to obtain the insurance...until during the claims process."[57] Moreover, Plaintiffs aver that Defendants "failed to give notice of the broad windstorm exclusion in the Axis policy, which essentially made the policy worthless."[58]

With respect to the third *Parker* factor, Plaintiffs contend that Bentley explained at the March 2011 meeting that "the full limit of the policy would be available in the event only a few stores were damaged."[59] Plaintiffs also aver that they believed they had purchased blanket coverage because

---

[54] *Id.* at p. 19.

[55] *Id.* (citing *Parker v. Lexington Ins. Co.*, No. 06-4156, 2006 WL 3328041 (E.D. La. Nov. 15, 2006)).

[56] *Id.* at p. 20 (citing Ex. 9).

[57] *Id.* at p. 20–21.

[58] *Id.* at p. 21.

[59] *Id.*

Bentley sent "the partial application to Plaintiffs with a list of their properties having no reference to limits, the summary of the Lexington policy without any reference to limits, and the failure to deliver the policy until after the loss."[60] Additionally, Plaintiffs allege that Bentley's assurances following the storm "bolstered" their beliefs that they had purchased blanket insurance.[61] Finally, according to Plaintiffs, the email sent by Upshaw to Plaintiffs on April 29, 2011 failed to serve as notice that each location had a rebuilding limit "because a blanket policy would contain a similar spreadsheet of values for the purpose of calculating the premium."[62]

In response to Defendants' argument that the valued policy statute precludes Plaintiffs from further recovery, Plaintiffs contend that the valued policy statute only applies to a scheduled policy with limits per location"[63] According to Plaintiffs, "the policy was not supposed to be a scheduled policy. Accepting this argument would require this Court to completely disregard the misrepresentations [Defendants] made with regard to the nature of the policy as a blanket-form policy."[64]

With respect to Defendants' contention that Plaintiffs have no claim under the policy because they failed to provide accurate values, Plaintiffs aver that Bentley made "misrepresentation[s] to Plaintiffs about his own expertise as an expert in estimating rebuilding costs."[65] Moreover, Plaintiffs state that "the $10 million dollar limit that they were led to believe would apply on a per occurrence

---

[60] *Id.*

[61] *Id.*

[62] *Id.* at 22.

[63] *Id.* (citing La. Rev. Stat. Ann. § 22:1318(D)).

[64] *Id.*

[65] *Id.* at p. 23.

basis was more than enough coverage, so increasing the values was not a pressing matter."[66] Finally, Plaintiffs contend that "Louisiana courts have never charged an insured with knowledge of a policy where previous policies would provide no notice of the current policy."[67]

Plaintiffs next contend that they "cannot be charged with any part of the insurance application that was not sent to them." Specifically, they aver that the pages sent by Upshaw contained a list of the insured properties without values anywhere on the page, so "nothing in the pages sent could serve to put Plaintiffs on notice that the coverage they applied for was not blanket insurance."[68] Additionally, "Plaintiffs cannot read documents they do not possess and cannot therefore be charged with knowledge of documents never sent to them."[69] With regard to Upshaw's contention that "parties must be aware of the content of the documents they sign, including items referenced but not attached to those documents," Plaintiffs "gladly accept this charge, since the only documents they signed included a list of properties without any limits per location."[70] Additionally, Plaintiffs argue that "the outstanding pages would not have provided notice that they were requesting a scheduled policy."[71] Moreover, Plaintiffs argue that Defendants "failed to sufficiently communicate the limitations and exclusions" on coverage,[72] and that the Upshaw Options booklet

---

[66] *Id.*

[67] *Id.* (citing *Aurillo v. Gressaffa*, 405 So.2d 664 (La. App. 4 Cir. 1981)*; Sims v. Insurance Unlimited of West Monroe*, No. 28234, (La. App. 2 Cir. 2/28/96), 669 So.2d 709)).

[68] *Id.*

[69] *Id.*

[70] *Id.* at p. 24.

[71] *Id.*

[72] *Id.*

contained on the last page "I accept the coverage, terms and conditions as outlined in the proposal presented by Upshaw Insurance Agency."[73]

Finally, Plaintiffs aver that

[Defendants'] reliance on La. C.C. art. 2623 to argue that Plaintiffs did not buy a policy based on the rebuilding costs they seek is misplaced. That article relates to a contract of sale but a service contract is at issue here. Aside from that disqualification, Plaintiffs and [Defendants] agree on both a thing and price. However, [Defendants] failed to deliver the thing on which the parties agree.[74]

## C.  *Defendant's Reply in Further Support*

In response to Plaintiffs' opposition brief, Defendants contend that there is no evidence of a "special relationship between [Plaintiffs] and Defendants whereby Plaintiffs relied on Defendants expertise and Defendants owed some sort of additional duty to properly value their property."[75] Defendants reiterate their reading of *Newman* and argue that "no Louisiana court has ever imposed a duty of an agent [sic] to value an insured's property, even if the agent recommends certain coverages or limits, or even if the agent is perceived as an 'expert.'"[76]

With regard to the valued policy law, Defendants contend that "[r]egardless of whether a policy is blanket or scheduled, the VPL applies to every policy where the premium is based on the values submitted by the insured and a total loss occurs from a covered peril."[77] According to Defendants, the Fifth Circuit has ruled that the VPL must be applied in such situations.[78] Finally,

---

[73] *Id.* at p. 24–25.

[74] *Id.* at p. 25.

[75] Rec. Doc. 115 at p. 3 (internal quotation marks omitted).

[76] *Id.* at p. 6 (emphasis omitted).

[77] *Id.* at p. 6.

[78] *Id.* at p. 6 (citing *Chauvin v. State Farm Fire & Casualty*, 495 F.3d 232 (5th Cir. 2007)).

Defendants argue that even if it had issued a blanket policy, as a matter of law it discharged its legal duty by procuring insurance in the exact amount at which Plaintiffs valued the property.[79]

Defendants also urge the court to "disallow all affidavits submitted by Mr. Bienvenu," because "contrary to his sworn affidavit, he did not sign the insurance application and necessarily, he also could not have verified the information which undisputedly was not attached to the application he did not sign."[80] Finally, Defendants urge that the court "should find that any 'belief' or 'understanding' the plaintiffs had that they were receiving a blanket policy of insurance instead of a scheduled policy of insurance is unreasonable as a matter of law."[81]

### D.    Upshaw's Supplemental Memorandum in Support

Upshaw reavers the arguments for summary judgment raised by Defendants in their Motion for Summary Judgment and argues that "the very claim the [P]laintiffs raise in their opposition memorandum has been rejected as a matter of law by the Louisiana Supreme Court, as confirmed by four opinions recently issued from the Eastern District of Louisiana."[82] Upshaw argues that these cases hold that the duty of reasonable diligence has been discharged when the insurance agent has procured the correct amount or type of insurance coverage.[83] "Once Upshaw procured property insurance (type) in the exact amount that plaintiffs' [sic] valued their property (amount), then as a

---

[79]    *Id.* at p. 3, n. 2.

[80]    *Id.* at p. 8–9.

[81]    *Id.* at p. 9.

[82]    Rec. Doc. 221 at p. 5, 8 (citing *Tufaro v. Fidelity National Property & Casualty Insurance Company*, 2013 U.S. Dist. LEXIS 178157 (E.D. La. Dec. 18, 2013); *Rodriguez v. Fidelity National Property & Casualty Insurance Co.* (E.D. LA Dec 11, 2013); *Morin v. American Bankers Insurance Company,* 2013 U.S. Dist. LEXIS 161162 (E.D. La. Nov. 11, 2013); *Picou v. Fid. Natl. Prop. Ins. Co.*, 2013 U.S. Dist. LEXIS 179636 (Dec. 20, 2013).

[83]    *Id.* at p. 6.

matter of law, Upshaw has discharged its duty of reasonable diligence."[84] Upshaw additionally argues that Plaintiffs' expert, Mr. Manes, "created his own 'spectrum' of duties owed by an insurance agent that has never been recognized by any court," and that he admitted he "disagreed" with the standard for insurance agents as set forth by the Louisiana Supreme Court in *Newman*.[85]

### E.    *Plaintiffs' Sur-Reply Memorandum in further Opposition*

In their sur-reply, Plaintiffs explain that they do not claim that Defendants were negligent in failing to advise them as to the correct amount and type of insurance they should purchase.[86] Instead, Plaintiffs reaver that Defendants misrepresented whether the Lexington policy was a blanket or scheduled policy.  Plaintiffs contend that "none of the [D]efendant's [sic] newly cited cases involve an insurance agent who actually undertook to consult and advise his clients based on the agent's superior knowledge of the insurance programs he was selling."[87] Moreover, "[u]nlike *Newman*, the instant case is replete with allegations that plaintiffs were misled into believing that they would receive coverage which was not delivered."[88] Plaintiffs argue that the Defendants "subjected themselves to a heightened duty that arises when an agent holds himself out to provide services greater than the mere order-taking insurance agent."[89] According to Plaintiffs, "[t]his

---

[84]  *Id.*

[85]  *Id.*

[86]  *Id.* at p. 3.

[87]  *Id.* at p. 1.

[88]  *Id.* at p. 4.

[89]  *Id.* at p. 3.

contention is based on a well-established legal principle that 'when a duty to protect others against a particular harm has been assumed ... liability may be created by a negligent breach of duty.'"[90]

### III. Standard on a Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[91] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[92] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[93] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[94] If the record, as a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[95]

---

[90]  *Id.* at p. 6 (citation omitted).

[91]  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[92]  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[93]  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[94]  *See, e.g., Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[95]  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

## IV. Law and Analysis

### A.  Applicable Law

This Court's subject matter jurisdiction was invoked pursuant to 28 U.S.C. § 1332, which provides original jurisdiction over civil actions between citizens of different states where the matter in controversy exceeds $75,000. As a federal court exercising diversity jurisdiction, it is "axiomatic" that this Court must apply Louisiana law to resolve matters of substantive law presented in the pending motion and "attempt to discern how Louisiana's highest court would resolve the issues at hand."[96] Although that doctrine is equally applicable when a federal court is "[a]ddressing an unsettled area of Louisiana law," federal courts should "avoid creating new rights and remedies in Louisiana state law where [the court] lack[s] express statutory authority or clear directive from the Louisiana Supreme Court."[97]

### B.  Analysis

Defendants argue that summary judgment is appropriate because Louisiana law does not impose a duty on insurance agents to independently or spontaneously advise clients as to the correct amount or type of insurance to best fit their needs. Plaintiffs do not seem to disagree with this interpretation of the law.[98] Instead, Plaintiffs contend that Defendants stood in a "special relationship" with Plaintiffs and thereby owed them a heightened duty to advise, and that this heightened duty was breached when Defendants allegedly misrepresented the terms of the Lexington policy.[99] The Court finds, accordingly, that Defendants' independent or spontaneous duty to advise

---

[96]  *In re Whitaker Const. Co. Inc.*, 411 F.3d 209, 209 n.4 (5th Cir. 2005) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[97]  *Id.*

[98]  Rec. Doc. 98 at p. 18.

[99]  Rec. Doc. 228 at p. 6-7.

is not at issue in this motion. However, what is at issue and disputed is whether Bentley owed Plaintiffs a heightened duty of reasonable diligence.

### 1.    Whether Bentley owed Plaintiffs a heightened duty of reasonable diligence

Louisiana law does not recognize a duty owed by an insurance agent to spontaneously advise or procure any specific type or amount of insurance coverage for a client.[100]   Rather, the responsibility rests with the insured to read his policy and request the required coverage.[101]  In *Offshore Production Contractors, Inc. v. Republic Underwriters Insurance Company*, a case upon which Plaintiffs rely, the Fifth Circuit noted that:

> Where an agent is familiar with the insured's business, has reason to know the risks against which an insured wants protection, and has experience with the types of coverage available in a particular market, we must construe an undertaking to procure insurance as an agreement by the agent to provide coverage for the client's specific concerns.[102]

In *Offshore*, Peter Barbara, an insurance agent who specialized in servicing oil companies, had worked with Offshore Production Contractors (OPC) for many years and had at least 30 years of experience in the insurance industry. He met with OPC's CEO and made recommendations for the acquisition of a blanket builder's risk policy which OPC later accepted on the condition that the policy include a stand-by clause that would cover the company in case of downtime due to bad weather.  Barbara helped draft the policy which, after several revisions, ultimately did not include the desired coverage. Suit was filed when OPC's insurance claim was denied following losses incurred due to inclement weather in the Gulf of Mexico which had effectively prevented OPC's

---

[100]  *Isidore Newman School v. J. Everett Eaves Inc.* 2009-2161 (La. 7/6/10), 42 So. 3d 352.

[101]  *Id.*

[102]   *Offshore Production Contractors, Inc. v. Republic Underwriters Insurance Company*, 910 F.2d 224, 230, (5th Cir.1990) (citations omitted).

operations there for nearly one month. The record indicated that Barbara did not provide OPC with a copy of its policy until well after the occurrence of the incident on which its insurance claim was based.[103] Noting that OPC would not have acquired stand-by coverage if it did not include coverage for potential weather delays, the court pointed out that during meetings with Barbara, OPC had expressed concerns over coverage for bad weather and that Barbara had acknowledged those expressions. Based on his actions and knowledge of OPC's desires, the court found that Barbara's duties included "advising his client with regard to recommended coverage" and informing him when the policy he procured did not cover "a specific risk about which the client expressed concern."[104]

In this case, Plaintiffs allege that Plaintiffs and Defendants had acquired a special relationship similar to that contemplated in *Offshore*. Plaintiffs argue that "[o]ver the years, [Bentley] personally inspected [its] stores, undertook to determine the appropriate amounts and types of coverage necessary for their protection, and knew of the risks against which Plaintiffs needed protection."[105]

The record indicates that Defendants had procured insurance for the Joplin properties under their previous owners, Specialty.[106] The record moreover indicates that Bentley considered himself a "consultant"[107] with "superior knowledge about the insurance."[108] Finally, Plaintiffs present

---

[103] *Offshore*, 910 F.2d at 226–29.

[104] *Id.* at 230–31.

[105] Rec. Doc. 98 at p. 19.

[106] Rec. Doc. 71–3 at p. 2.

[107] Bentley deposition at p. 34
   Q: So you are essentially, because of your experience and training, a consultant to your clients for insurance purposes?
   A: Yes.

[108] *Id.* at p. 265-266
   Q: –you acted as a consultant; correct?
   A: Correct.

evidence that Bentley essentially selected certain provisions of Plaintiffs' 2011-2012 insurance package for them.[109] However, Plaintiffs fail to point to evidence in the record that indicates that they specifically asked Bentley to procure blanket coverage. In fact, the Court can find only ambiguous references to what was, or was not, requested during the March 2011 meeting.[110]

Based on the totality of evidence presented, and taking the evidence in the light most favorable to Plaintiffs, the Court finds that there is a genuine issue of material fact as to whether Bentley voluntarily assumed a duty beyond acting with reasonable diligence to explain each policy provision.

**C.** **Whether Plaintiffs may prevail against Defendants on a Negligent Misrepresentation claim**

Under Louisiana law, insurance agents have a duty to supply their customers with correct information, and they may be liable for negligent misrepresentation when they provide incorrect information and an insured is thereby damaged.[111] At the same time, however, the client is responsible for reading the policy received and for assessing the amount and type of coverage needed.[112] To establish negligent misrepresentation under Louisiana law, a plaintiff must prove

---

Q: You were giving them advice?
A: Correct.
Q: And the reason you could give them advice is because you had superior knowledge about the insurance that you were handling for them?
A: Had knowledge about the program I was handling for them. That's correct.
Q: Superior to them?
A: Absolutely

[109] *Id.* at p. 76-77.

[110] *See* Bastion deposition at p. 102 (Q: At this meeting do you recall if you or Mr. Bienvenu or Mr. Ashley told Mr. Bentley that the Chubb policy had sub limits and you did not want that? A: I don't recall. Q: Okay. You did not? A: No.).

[111] *See, e.g., Venture Assocs. Inc. of La. v. Trans. Underwriters of La.,* 634 So.2d 4, 6–7 (La. Ct. App. 1994), *Plauche v. Auto Club Family Ins. Co.*, 2007 WL 519260 (E.D. La. Feb. 14, 2007).

[112] *Isidore,* 42 So. 3d at 359.

three elements: (1) the defendant owed a duty to supply correct information, (2) the defendant breached that duty, and (3) the plaintiff suffered damages resulting from justifiable reliance on the misrepresentation.[113]

It is clear that Defendants, as an insurance agency, owed Plaintiff a duty to provide correct information. It is less clear whether Defendants breached that duty. The Parties dispute whether Bentley misrepresented the terms of the Policy to Plaintiffs. In denying that they warranted that the policy would provide blanket coverage, Defendants contend that the written proposal does not use the terms "blanket" or $10 million "per occurrence."[114] Defendants additionally point to the deposition testimony of both Bastion and Ashley to support the contention that Bentley did not warrant to Plaintiffs that the total insured values and the building limits were not applicable.[115] However, both Bastion and Ashley testified that the values in the TIV column were not discussed at all.[116]

Plaintiffs claim that Bentley did not use the term "blanket coverage" in the March 2011 meeting, but that Bentley represented that in the event of a covered event, the policy would provide a "pool" of $10 million.[117] Plaintiffs further point to deposition testimony by Bienvenu, Bastion and

---

[113] *Id.* (citing *Abbott v. Equity Grp., Inc.,* 2 F.3d 613, 624 n. 38 (5th Cir.1993)).

[114] Rec. Doc. 115 at p. 3.

[115] Rec. Doc. 71–3 at p. 8.

[116] Bastion deposition at 99; Ashley deposition at 162. *See also* Bienvenue deposition at 143.

[117] *See* Ashley deposition, pp. 142-43 (testifying that "what Bob Bentley said was in this discussion that he felt like the $10 million, he said even if the Florida coast stores, if all those were destroyed, if your Mississippi coast stores were totally destroyed, your Louisiana coastal stores were all destroyed, in Texas, if it was one storm that went through that particular group and would wipe out all the stores, you would have enough coverage with the $10 million."); *See also* Bastion deposition at p. 99, 4-9:
Q. Okay. What did you understand?
A. That I had a $10 million limit with an umbrella policy.
Q: Why did you presume that there was a $10 million limit?
A: Because that was what was discussed.).

Ashley alleging that Bentley did not explain or mention any "per location" limit on the insurance or on recovery except the $10 million Limit of Liability.[118] Finally, Plaintiffs refer to Bentley's own testimony that he did not read, and did not know, the details of the Lexington policy prior to the meeting.[119] Accordingly, the Court finds that the record indicates a genuine issue of material fact regarding whether Bentley represented that the Lexington contract would provide blanket coverage.

The third element of negligent misrepresentation requires Plaintiffs to prove that they suffered damages resulting from justifiable reliance on Defendants' alleged misrepresentation. Under Louisiana law, "[i]t is well settled that it is the insured's obligation to read the policy when received, since the insured is deemed to know the policy contents."[120] Accordingly, Louisiana courts have held that an insured's reliance on an insurer's alleged misrepresentation is not justifiable when the terms of the policy clearly reveal that the alleged misrepresentation was inaccurate.[121] Here, there is a genuine issue of material fact as to whether Plaintiffs' reliance on Bentley's representations was justifiable.

The Fifth Circuit's holding in *Campo v. Allstate Ins. Co.* is instructive.[122] In that case, Campo's flood insurance policy expired and Allstate sent him a notice of the expiration, along with the option of retroactive renewal. During the grace period, Campo's property was destroyed by

---

[118] Bienvenu Affidavit; Bienvenu deposition at p. 373; Bastion deposition at p. 282, 292; Ashley deposition at p. 142-43.

[119] Bentley deposition at p. 266.

[120] *Isidore Newman School v. J. Everett Eaves, Inc.,* 2009-2161 (La. 7/6/10), 42 So. 3d 352, 359.

[121] *See, e.g.,Campo v. Allstate Ins. Co.*, 440 F. App'x 298, 301 (5th Cir. 2011); *City Blueprint & Supply Co.,* 2008-1093 (La. App. 4 Cir. 12/17/08), 3 So. 3d 62, 67 ("City Blueprint's reliance on the [insurer's alleged] statement to mean that it had flood insurance was unreasonable in light of the fact that the policy in this case specifically contains a straightforward, uncomplicated, exclusion against damage caused by flood.").

[122] *Campo v. Allstate Ins. Co.*, 440 F. App'x 298, 301 (5th Cir. 2011).

Hurricane Katrina. Campo filed a claim with Allstate, which issued Campo an advance check on the policy. Two weeks after the grace period expired, Allstate notified Campo that his claim was denied because the policy had lapsed prior to the Hurricane. The district court found that Campo had proven all three elements of negligent misrepresentation by a preponderance of the evidence. The Fifth Circuit, however, found that Campo was not justified in relying on any representation made by Allstate when he failed to pay his insurance premium because the terms of his policy clearly provided that he would be without coverage once his policy expired, unless he retroactively reinstated that coverage by timely paying his renewal premium within the grace period.[123]

Here, unlike in *Campo*, evidence in the record suggests that Plaintiffs were not provided with a copy of the Lexington or Axis policies until June 24, 2011, one month after the loss of the properties.[124] Plaintiffs contend that they therefore could not have reviewed the policy prior to the destruction of the Joplin properties, and that previous policies would not have provided notice as to the current year's limitations for each location.[125] On the other hand, Plaintiffs present no evidence that they made any inquiry into the status or amount of its insurance coverage prior to the May 2011 tornado, nor do they allege that they requested a copy of the insurance application. Plaintiffs themselves point to Bienvenue's deposition testimony stating that Plaintiffs trusted Bentley's assessments to the extent that Plaintiffs did not independently assess the values listed on the schedule.[126]

---

[123] *Id.*

[124] Rec. Doc. 98 at p. 10.

[125] *Id.* at p. 16.

[126] Bienvenue deposition at pp. 43-44:

> Q: Under the column titled Building, did the three companies, or I guess at that time the two companies, perform any analysis to verify that thte values listed for each location were sufficient to

Defendants argue that the written insurance application executed by both Plaintiffs and Defendants "unambiguously requests scheduled coverage with a total insured value for each restaurant location and a total limit of $1.19 million for the two Joplin restaurants. The application does not request blanket coverage."[127] However, Plaintiffs dispute Defendants' interpretation of what that document represented. The Court accordingly finds that a genuine issue of material fact exists as to whether Plaintiffs' reliance on Bentley's alleged representations was justifiable.

### 3. Whether Plaintiffs Claims Should be Dismissed Based on Statutory or Contract Law

Defendants argue that Plaintiffs have already received the full amount of recovery allowed under "Louisiana Valued Policy Law," which "mandates that in the case of a total loss the insurer shall compensate the insured at the value used to determine the premium."[128] Tthe VPL reads in relevant part:

---

rebuild each location in the event of a total loss?

A: When we went to hire Upshaw, we hired Bob Bentley. Upshaw came with the package, but we talked to Bob Bentley and we brought him in as a member of our team. So, before we did anything, we talked to our accountant, our lawyer, and Bob Bentley. Bob Bentley would make suggestions to us and we trusted him, must like we trust Darrell, I trust Scott, he trusts me. So, when they sent over a spreadsheet of values like this (indicating), we didn't dig into the values. We've always been told from the beginning that he has a program, he puts information and it tells him what to – what to insure things for. He represents construction companies and building owners around the country in 40 states. He has superior knowledge, and I think he said – maybe it wasn't in those terms, that he knows this – he told us and I think maybe even in his deposition he mentioned that he knows construction all around the country. We trusted him and we trusted his values.

Q: So, the answer to my question is no; correct, sir? No one in the three companies made any assessment to verify that the values on this list were sufficient to rebuild any given location; is that –

A: Correct.

[127] Rec Doc. 115 (citing Rec. Doc. 71-23).

[128] Rec. Doc. 71–3 at p. 17-19 (citing La. Rev. Stat. § 22:1318; *Chauvin v. State Farm Fire & Cas. Co.*, 495 F.3d 232 (5th Cir. 2007)).

A. Under any fire insurance policy insuring inanimate, immovable property in this state, if the insurer places a valuation upon the covered property and uses such valuation for purposes of determining the premium charge to be made under the policy, in the case of total loss the insurer shall compute and indemnify or compensate any covered loss of, or damage to, such property which occurs during the term of the policy at such valuation without deduction or offset, *unless a different method is to be used in the computation of loss*, in which latter case, the policy, and any application therefor, shall set forth in type of equal size, the actual method of such loss computation by the insurer [.][129]

Because the issue here is what method was to be used in the computation of loss, the Court finds Defendants' arguments pursuant to the VPL do not warrant summary judgment.

Defendants' claims under contract law are unpersuasive. Defendants argue that "the law is absolute that by signing the application signature page[,] the insureds are bound by the contents of the insurance application."[130] However, Defendants' interpretation of the case law is misleading. For instance, Defendants cite *Tweedel v. Brasseaux* for the proposition that "[t]he presumption is that parties are aware of the contents of writings to which they have affixed their signatures," but Defendants omit the remainder of that paragraph, which states that "[t]he burden of proof is upon [Plaintiffs] to establish with reasonable certainty that they have been deceived."[131] Because Plaintiffs have established a genuine issue of material fact with regard to whether Bentley misrepresented the terms of the policy, Defendants' contract argument is unavailing.

---

[129] La. Rev. Stat. § 22:695 (emphasis added).

[130] Rec. Doc. 71-3 at p. 20.

[131] *Tweedel v. Brasseaux*, 433 So. 2d 133, 137 (La. 1983).

## V. Conclusion

Plaintiffs have demonstrated that the evidence in the record shows genuine disputes of material fact regarding whether Bentley owed a heightened duty of reasonable diligence to Plaintiffs, whether Bentley misrepresented the terms of the Lexington policy, and whether Plaintiffs' reliance on those alleged misrepresentations was justifiable. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment on the Issue of Liability[132] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this <u>18th</u> day of September, 2014.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[132] Rec. Doc. 71.