# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NOLA VENTURES, LLC ET AL** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 12-1026** |
| **UPSHAW INSURANCE AGENCY, INC. ET AL** | **SECTION: G(2)** |

## ORDER

This litigation involves an insurance dispute arising out of a May 2011 tornado in Joplin, Missouri that destroyed two Arby's restaurants owned and/or operated by Nola Ventures LLC, Nola Restaurant Group LLC, and Critical Mass Holdings LLC (collectively, "Plaintiffs"). Plaintiffs allege that Defendants Upshaw Insurance Agency, Inc. ("Upshaw") and Upshaw agent Robert Bentley ("Bentley") (collectively, "Defendants") negligently misrepresented the type of coverage provided by the insurance policy that Upshaw procured for them.

Before the Court is Defendants' "Motion for Summary Judgment on the Issue of Damages,"[1] wherein Defendants move for summary judgment with regard to all damages and, in the alternative, for partial summary judgment with regard to each item of damage.[2] Having considered the motion, the memoranda, the record, and the applicable law, the Court denies the motion in part and grants the motion in part.

---

[1] Rec. Doc. 72.

[2] Rec. Doc. 72–3 at p. 1–2.

# I. Background

## A.    *Factual Background*

NOLA Ventures, LLC ("NOLA Ventures") is an "Arby's Roast Beef" restaurant franchisee. Critical Mass Holdings, LLC ("CMH") owns certain property from which some NOLA Ventures restaurants operate. NOLA Restaurant Group, LLC manages all of NOLA Ventures' restaurants. In 2007, Plaintiffs acquired two Arby's restaurants in Joplin, Missouri (the "Main Street" and "Range Line" properties) (collectively, the "Joplin properties") and asked Robert Bentley, agent for Upshaw Insurance, to procure commercial insurance for both locations.[3]    Upshaw procured insurance for Plaintiffs for the following four years. On March 23, 2011, during a meeting with Bentley to discuss insurance options for the 2011-2012 insurance year, Plaintiffs selected the "Lexington Option"[4] with the Axis excess layer policy.[5]

In their complaint, Plaintiffs allege that Defendants represented the 2011-2012 Lexington property policy to be a "blanket" policy, in which "the pool of monies available to cover a physical loss occurrence at any of the plaintiffs' restaurants consisted of the $10,000,000 Primary Layer of insurance and the $13,152,000 Excess Layer of insurance and that the policies would cover the cost to replace the insured property without other limits."[6] The Lexington policy was actually a scheduled policy, whereby the coverage of each property was limited to a dollar amount which the insurer made applicable to each location. The dollar limit for each location was insufficient for rebuilding

---

[3]  Rec. Doc. 71–5.

[4]  Rec. Doc. 71–30 (hereinafter "Bastion deposition") at p. 93.

[5]  Rec. Doc. 98 at p. 1.

[6]  Rec. Doc. 1–1 at p. 3.

the Joplin properties.[7]  Plaintiffs have recovered the total insured value for each Joplin property, totaling $1.19 million, from Lexington.[8]

On September 9, 2013, Plaintiffs submitted the report of Dr. Kenneth J. Boudreaux ("Boudreaux") on the issue of damages.  According to Boudreaux's report, Plaintiffs allege damages arising from: (1) the loss of the Main Street and Range Line properties; (2) the necessary sale of the Main Street land "in an untimely manner and at a distress price," with associated adverse tax effects; (3) settlement of the lease on the Range Line property; (4) the required partial paying down of a loan from General Electric Capital ("GE")'s financing subsidiary, with associated adverse tax effects; (5) the effects of cash flow shortages, increased overheads, and other deleterious business effects on NOLA Ventures' business operations; (6) reduced lease payments by NOLA Ventures to CMH; (7) loss of the opportunity to acquire additional Arby's restaurants in Ft. Lauderdale, Florida; (8) the cost of Axis excess insurance coverage that produced no benefits to Plaintiffs; and (9) the "inappropriateness of using insurance proceeds received by [P]laintiffs as offsets to their economic losses."[9] The resulting "Net Loss Before Interactions," according to Boudreaux, is $10,946,898.[10] Defendants now seek summary judgment on several of these damages items.

---

[7]  *Id.* at p. 5.

[8]  *See* Rec. Doc. 70–3 (hereinafter "Boudreaux report") at p. 13.

[9]  Boudreaux report at p. 4–5.

[10]  *Id.* at p. 13. The final page of Boudreaux's report lists the following itemized damages and credits allegedly sustained by Plaintiffs: (1) "NOLA's Loss of Joplin Arby's Business Value" ($900,000); (2) "Cost to Reestablish Two Joplin Arby's" ($2,183,000); (3)  "Amount Paid by Insurer" ($1,190,000); (4)" Insurance shortfall to Rebuild" ($993,000); (5) "CMH Loss of Main Street Property" ($626,025); (6) "NOLA's Settlement of Range Line Lease" ($250,000); (7) "Plaintiffs' Losses on GE Loan" (202,342); (8) "NOLA Interest Cost to Arby's" ($16,892); (9)" NOLA's Lost Business Value" ($2,225,495); (10) "CMH's Lost Lease Values" ($3,157,763); (11) "Lost Fort Lauderdale Business Opportunity" ($2,936,909); (12) "Loss of Axis Insurance Premium" ($22,172).  Boudreaux apparently deducts from that sum Offset for Reduced GE Debt ($383,700).

### B.    *Procedural Background*

On April 23, 2012, Plaintiffs filed suit in 24th Judicial District Court, Jefferson Parish, for damages "which resulted from the defendants' negligence, misrepresentation, want of care, fault and breach of fiduciary duty."[11] Defendants removed to this Court on the grounds of diversity jurisdiction.[12] Defendants filed the pending motion on September 9, 2013.[13] Plaintiffs filed a memorandum in opposition on September 23, 2013.[14] On September 25, 2013, Defendants filed a reply.[15] Defendants filed a supplemental memorandum on November 12, 2013,[16] and Plaintiffs filed a sur-reply on March 11, 2014.[17]

## II. Parties' Arguments

### A.    *Defendants' Arguments in Support*

Defendants move for summary judgment with respect to the following items of damage: (1) CMH's claim for loss of future rent of the Main Street property in the amount of $626,0253; (2) NOLA Ventures' settlement of the Range Line lease for $250,000; (3) NOLA Ventures' loss valuation of $900,000; (4) Plaintiffs' income taxes of $383,700 and loan modification fee of $45,000 related to its loan from GE (the "GE loan"); (5) NOLA Ventures' lost business value calculation of

---

[11]  Rec. Doc. 1–1.

[12]  Rec. Doc. 1.

[13]  Rec. Doc. 71.

[14]  Rec. Doc. 96.

[15]  Rec. Doc. 117.

[16]  Rec. Doc. 193.

[17]  Rec. Doc. 219.

$2,225,495; (6) CMH's lost lease values; (7) NOLA Ventures' alleged lost business opportunity in Ft. Lauderdale; (8) "Worthless Axis Policy" damages; and (9) all other damages claims.[18]

1. **CMH's claim for lost rent of the Main Street property in the amount of $626,0253**

Defendants argue that summary judgment is appropriate with respect to the damages identified in Boudreaux's opinion that "because the restaurant was not rebuilt, plaintiff/insured CMH lost future lease payments over the life of the lease (through 2026 from plaintiff/insured NOLA Ventures) in the amount of $626,025."[19] First, Defendants contend that CMH has no claim for future lost rentals as a matter of law because it never placed NOLA Ventures in default or provided NOLA Ventures with a written notice of termination, which Defendants claim are both required under the terms of the CMH-NOLA Ventures lease for the Main Street property.[20]

Next, Defendants argue that CMH has no right of action because it "has been made whole."[21] Defendants contend that NOLA was required to carry rebuilding insurance and name CMH as a payee, so NOLA was entitled to the insurance proceeds for rebuilding and CMH was "simply entitled to insurance proceeds as a loss payee."[22] Therefore, Defendants argue, CMH has already received all amounts owed to a loss payee and is not entitled to recover for failure to rebuild.[23] According to Defendants, to allow CMH to recover future rentals for the Main Street property would

---

[18] Rec. Doc. 72–63.

[19] Rec. Doc. 72–3 at p. 2.

[20] *Id.* at p. 2–3 (citing Rec. Doc. 72–4 at pp. 23–28).

[21] *Id.*

[22] *Id.* (citing Rec. Doc. 72–6).

[23] *Id.* at p. 4.

be akin to allowing a "double recovery" because "only one of the plaintiffs would be entitled to insurance proceeds for rebuilding costs."[24]

Defendants further contend that CMH's and NOLA Ventures' damages and credits "offset" each other. Specifically,

> CMH is claiming that it lost future rentals in the amount of $626,025. However, at the same time, NOLA Ventures has a corresponding benefit in that exact same amount. NOLA does not have to pay rent in the amount of $626,025. There is no damage here. It is a complete wash.[25]

Defendant moreover avers that if the Court finds that CMH is entitled to recover future loss rentals, "then necessarily Upshaw is entitled to a credit in the exact same amount against any damages claimed by NOLA."[26] Defendants argue that Plaintiffs' expert failed to offset the amount of insurance received by CMH, $383,760.25, and any damages CMH obtains should be offset by that amount.[27] Finally, Defendants aver that CMH sold the property in 2012, and therefore cannot collect rents on a property that it does not own.[28]

## 2. NOLA's settlement of Range Line lease in the amount of $250,000

Defendants argue that NOLA Ventures paid $250,000 to settle its lease on the Range Line property, but that $226,340 of this sum was paid directly out of settlement proceeds.[29] Defendants aver that "there is no evidence that the remaining $23,760 was not also paid out of the $1.19 million

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at p. 5.

[28] *Id.*

[29] *Id.*

insurance proceeds received by NOLA. Necessarily, this amount of damages must be dismissed. There is no evidence that insurance proceeds did not pay this entire amount."[30]

### 3. NOLA's loss valuation of $900,000 based on the U.S. Beef offer

Defendants aver that Boudreaux erroneously calculated a $900,000 loss of valuation based on an offer to purchase the two restaurants by U.S. Beef in 2008.[31] Defendants argue that "[i]t is well settled that a mere offer, unaccepted, to buy or sell is inadmissible to establish market value."[32] Moreover, Defendants argue, the offer is not reliable as a matter of law because (1) Plaintiffs do not offer evidence as to why the sale did not go through, and cannot establish whether that price was viable;[33] and (2) "[i]t is undisputed that the sales for these restaurants went down 18% from 2008 to 2010, thereby making any offer from 2008 completely unreliable as a matter of law according to plaintiffs' own economist."[34]

Under Louisiana law, Defendants contend, the proper measure of valuation must be performed at the time the business was destroyed and "based on profits."[35] Defendants rely on *Achee v. National Tea Co.*, wherein, according to Defendants, "the court took the profit from the

---

[30] *Id.* at pp. 5–6.

[31] *Id.* at p. 6.

[32] *Id.* at p. 7 (citing *United States v. Smith*, 355 F.2d 807 (5th Cir. 1966)). (citing *Sharp v. United States*, 191 U.S. 341 (1903); *St. Joe Paper Co. v. United States*, 155 F.2d 93 (5th Cir. 1946); *United States v. Playa de Flor Land & Improvement Co.*, 160 F.2d 131 (5th Cir. 1947).

[33] *Id.* at p. 9.

[34] *Id.* (citing Rec. Doc. 72–10 (hereinafter "Boudreaux deposition") at p. 20).

[35] *Id.* at p. 7 (citing *Achee v. National Tea Co.*, 95 CA 2556 (La. 1st Cir. 1996) 686 So.2d 121; *Perfect Co. v. Essex Ins. Co.*, No. 07-7642, 2010 WL 2835889 (E.D. La. July 15, 2010)).

prior year and multiplied it by three to obtain loss valuation damages."[36] Defendants argue that the

Joplin restaurants

> had no profits and indeed were losing money. In 2010[,] Range Line was showing a net loss for the year of $4,303. Up until the time of the tornado in 2011, Range Line was showing a net loss of $4,025. Similarly, in 2010 Main Street was showing a net loss of $6,594 for the year and a net loss of $6,559 through the time of the tornado in 2011. There were no profits.[37]

According to Defendants, Boudreaux did not try to calculate whether the Joplin stores were making

or losing money.[38] However, Defendants aver that the Joplin restaurants were unprofitable during

the year and a half prior to their destruction. Defendants contend that "because there is no valuation

record evidence at the time of the destruction, there can be no loss of valuation damages."[39]

Finally, Defendants again argue that Plaintiffs have already received more in insurance

proceeds than the purported loss of valuation, and have therefore incurred no damages.[40] Defendants

contend that "[Plaintiffs] are only entitled to damages to the extent they can prove they incurred

damages greater than the amount of $1.19 million."[41]

---

[36] *Id.*(citing *Achee v. National Tea Co,*, 95 CA 2556 (La. 1st Cir. 1996) 686 So.2d 121).

[37] *Id.* at p. 8.

[38] *Id.* (citing Boudreaux deposition at pp. 24–25).

[39] *Id.* at p. 9

[40] *Id.* (citing *Bellard v. Am. Cent. Ins. Co.*, 2007-1335 (La. 4/18/08), 980 So.2d 654).

[41] *Id.*

### 4. Income taxes and loan modification fee related to GE loan

After cessation of operations at the Main Street location, Plaintiffs repaid a $383,700 loan to GE, the holder of a mortgage on that property (the "GE loan"), for which Plaintiffs had to pay income taxes. Additionally, GE charged a fee of $45,000 for a loan modification.[42]

Defendants argue that "[a] taxable income event is not a 'damage.' Further, the [P]laintiffs would have to pay this income tax in any event whenever the loan was ultimately paid."[43]  With regard to the loan modification fee, Defendants contend that Plaintiffs bear the burden of proof on causation, and that Plaintiffs have not pointed to any evidence in the record that the GE loan modification was caused by a lack of insurance proceeds for rebuilding or loss of revenue caused by the Joplin tornado.[44] Specifically, Defendants allege that "Boudreaux performed no calculations to determine whether 'any' cash flow issue from Joplin caused GE to require a loan modification, let alone all of the GE cash flow issue."[45] Finally, Defendants argue that plaintiffs have not produced their federal income tax returns, so "[t]here is no record evidence that Plaintiffs reported the GE repayment as income and if so how much plaintiffs paid in taxes on it other than plaintiffs own hearsay statements."[46]

---

[42] *Id.* at p. 10.

[43] *Id.*

[44] *Id.* at p. 11.

[45] *Id.*

[46] *Id.* at p. 12.

### 5. NOLA lost business value calculation of $2,225,495

Defendants argue that Boudreaux erred when he derived a valuation loss of $2,225,495 by comparing company-wide sales in 2010 to company-wide sales in 2011.[47] According to Defendants, Boudreaux conceded that he did not know if the decrease in sales in 2011 was the result of the loss of the Joplin properties, and was unaware that the Slidell and LaPlace stores closed in early 2011.[48] Defendants argue that because Boudreaux "could not say more probably than not that the cause of the decrease in sales from 2010 to 2011 was the failure to rebuild the Joplin stores," this damages claim fails as a matter of law.[49]

Defendants also argue that Boudreaux submitted a loss valuation of $900,000 for the Joplin restaurants, but that he then additionally submitted a loss valuation of $2,225,495 "for the same businesses."[50] According to Defendants, "[a]s a matter of law, an expert economist's calculations of loss valuations for the same business which are 300% apart are inherently unreliable. No federal court has ever allowed expert testimony to prove damages where the rate of error for his method was more than 300%."[51]

### 6. CMH's claim for lost lease values

Defendants argue that "Boudreaux does not try to differentiate the amount of loss contributed in this damage item by Range Line (if any) as opposed to the amount caused by Main Street (if

---

[47] *Id.*

[48] *Id.* (citing Boudreaux deposition at pp. 110–11).

[49] *Id.* at p. 13.

[50] *Id.*

[51] *Id.*.

any).”[52] Defendants contend that as a matter of law, CMH cannot recover for the Range Line property, which CMH did not own or lease.[53] Moreover, Defendants argue that Boudreaux erroneously calculated the CMH lost lease value damages through the year 2026, without analyzing 2012 or 2013 financials "to see if the other 29 Arby's [restaurants] could now meet their rental payments."[54]

Defendants reaver that the CMH lost lease value is "not a true damage" because both CMH and NOLA Ventures have identical members, so "CMH is entitled to zero for this damage item because the members are 'congruent.'"[55] Defendants further repeat their contention that Plaintiffs have not met their burden of proof on causation because:

> [I]t is undisputed that the two Joplin properties were losing money in 2010 and 2011. As such, they were not contributing to the lease payments of the other 29 stores. Accordingly, necessarily, the closure of the two Joplin stores in no way could have caused the other stores to have become unable to meet their lease payments to CMH as a matter of law. There is simply no record evidence that profits from the Joplin stores (or revenues from the Joplin stores) were being used to help prop up the other stores and being used to help those other stores make their lease payments to CMH (and certainly not in the amount of $252,620 one year.[56]

### 7. NOLA Ventures' alleged lost business opportunity in Ft. Lauderdale

Defendants next turn to Boudreaux's contention that NOLA Ventures had defaulted on certain payments to its Arby's franchiser, and as a result, NOLA Ventures lost the opportunity to

---

[52] *Id.* at p. 15.

[53] *Id.*

[54] *Id.*

[55] *Id.* at pp. 16–17 (citing Boudreaux deposition at p. 31) Specifically, Defendants argue that "NOLA Ventures gets a credit in the exact same amount of the lease reduction to CMH. The plaintiffs are essentially using a voluntary accounting maneuver between two affiliated companies with common/identical ownership to create a damage item here. The loss of one affiliated company is exactly compensated by the gain of another affiliated company." *Id.*

[56] *Id.* at p. 15.

acquire additional Arby's restaurants in Fort Lauderdale, Florida.[57] Defendants argue that the default at issue occurred during May through August 2011, so "[e]ven if plaintiffs had properly scheduled their property for the full rebuilding amount, the two restaurants would not have been opened by the time of the Arby's default. Necessarily, there can be absolutely no causation between this default and the lack of sufficient insurance to rebuild."[58]

Defendants aver that the lost business opportunity at issue was between Lauderdale Group LLC – a corporation formed or to be formed by Bienvenu and Bastion – and Crystal Bridge Inc. Defendants point to several cases that, Defendants contend, support the proposition that Louisiana law prohibits an individual member of a limited liability company from pursuing an action for damages to the limited liability company's property.[59]

> Al Bienvenu and Scott Bastion are not insureds under the policy and are not plaintiffs in this litigation. As such, it is irrelevant whether or not they incurred any damages. They are not entitled to recover monies from an insurance agent when they are not the insured, they are not entitled to recover money in this lawsuit when they are not plaintiffs and have not stated a claim.[60]

Defendants additionally point to testimony from the Arby's corporate deposition that "this Florida transaction was a 'non-starter prior to the Joplin tornado, due to previous defaults by NOLA."[61] Finally, Defendants argue that Plaintiffs' "expected Ft. Lauderdale results" are too speculative as a matter of law and that "Mr. Boudreaux admitted at his deposition that he did not

---

[57] *Id.* at p. 17. Defendants state that they understand that this item of damage is directed at Lexington Insurance Company.

[58] *Id.*

[59] *Id.* at p. 18 (citing, among other cases, *Lightfoot v. Hartford Fire Insurance Co.*, 07-4833, 2012 WL 967086 (E.D. La. Mar. 20, 2012)).

[60] *Id.* at p. 19.

[61] *Id.*

perform any financial calculations with regard to these future 'projections.' As such, there is no expert testimony with regard to these future lost profits."[62]

### 8.     Axis policy damages

Defendants contend that Plaintiffs have no cause of action with regard to the Axis policy because "[i]t is undisputed that the excess policy would never be triggered even if plaintiffs were entitled to all insurance proceeds they are claiming herein."[63]

### 9.     All other damage claims

Defendants argue that summary judgment is appropriate with regard to any other damages claims. Defendants aver that there is no record evidence that any loss of revenue from the Joplin restaurants has caused any consequential damages to Plaintiffs, or that "[P]laintiffs would have to prove with regard to any other consequential damages that the amount of insurance proceeds received by plaintiffs ($1.19 million) was not sufficient to cover those consequential damages."[64]

According to Defendants, "[u]nder the Lexington policy and under Louisiana law, rebuilding is a condition precedent to receipt of rebuilding costs instead of actual cash value."[65] Defendants argue that since Plaintiffs did not rebuild either Joplin location – they settled the lease with the landlord for one location and sold the other – any claim for rebuilding costs should be disallowed as double recovery under Louisiana law.[66] With respect to the Lexington policy, Defendants argue that the policy provides that "[p]roperty that is not repaired or replaced within two (2) years after

---

[62] *Id.*

[63] *Id.* at pp. 23–24.

[64] *Id.* at p. 23.

[65] *Id.* at p. 20.

[66] *Id.* at p. 20 (citing *Bradley v. Allstate Ins. Co.*, 620 F.3d 509 (5th Cir. 2010)).

the date of loss (unless such requirement is waived by the company in writing) will be valued at actual cash value at the time and place of the loss."[67] Defendants further allege that "[P]laintiffs admitted that they did not request Upshaw to procure insurance that did not require rebuilding in order to get replacement cost[s]."[68]

**B.      *Plaintiffs' Argument in Opposition***

In opposition to Defendants' motion, Plaintiffs assert that their:

> [C]laims against Upshaw are not based upon breach of a lease, a policy, or any contract other than their agreement with Upshaw. Instead, plaintiffs have sued Upshaw for damages resulting from Upshaw's 'negligence, misrepresentation, want of care, fault and breach of fiduciary duty' in failing to procure the insurance plaintiffs wanted and Upshaw assured plaintiffs they would have.[69]

Additionally, Plaintiffs aver that Defendants use only Boudreaux's testimony ("an expert economist who was not retained to discuss causation"), and ignore testimony from Nola Ventures' witnesses Al Bienvenu, Scott Bastion and Darrell Ashley on causation.[70] Plaintiffs aver throughout their opposition memorandum that the $1.19 million paid by Lexington was only to replace damaged property in Joplin, not to compensate Plaintiffs for other alleged damages.[71]

**1.      CMH's claim for lost rent of the Main Street property**

Plaintiffs claim that prior to the 2011 tornado, NOLA Ventures leased the Main Street property from CMH for $59,076 annually.[72] According to Plaintiffs, after the tornado, NOLA

---

[67] *Id.* at p. 21 (citing Rec. Doc. 72–15 at p. 7).

[68] *Id.*

[69] Rec. Doc. 96 at p. 1.

[70] *Id.* at pp. 1–2.

[71] *Id.* at p. 14.

[72] *Id.* at p. 4.

Ventures was unable to make its lease payments, and CMH "had no choice due to its GE loans but to sell the Main Street land (the building was totally destroyed by the tornado and removed) for $112,425 to an unrelated entity, the best price CMH could obtain in the short time allowed for the transaction."[73] Plaintiffs contend that CMH lost $626,025, which represents the difference between the lease value of $738,450 (had CMH and NOLA Ventures been able to rebuild the Main Street location and resume operations there) and the land's sale price of $112,425.[74]

In response to Defendants' argument that CMH is not entitled to loss of rent because it did not place NOLA Ventures in default or provide written notice of termination, Plaintiffs argue that Defendants cannot use a contract to which it is not a party to shield it from liability.[75] Moreover, according to Plaintiffs, "it is apparent CMH and NOLA Ventures tacitly agreed that written notice of default was unnecessary given the total loss of the leased properties."[76]

With respect to Defendants' argument that CMH is not entitled to lost future rents because CMH has received the sale price of the Joplin properties, Plaintiffs aver that what they recovered from Lexington is not determinative of its claim for loss of rents because "[w]hen a plaintiff sues its insurance agent in tort for breach of duty, its damages are not limited by the policy."[77] Plaintiffs

---

[73] *Id.*

[74] *Id.*

[75] *Id.* at p. 5.

[76] *Id.* at pp. 5–6.

[77] *Id.* at pp. 6–7 (citing *Prest v. Louisiana Citizens Prop. Ins. Corp.*, No. 12-0513, (12/4/12); So.3d, 2012 WL 6015594 at *12)..

argue that CMH's claim for lost rental income from Defendants is in addition to amounts for building damage ultimately paid by Lexington.[78]  Specifically, Plaintiffs argue that:

> [A] specific requirement in the loan agreement with GE required that the leased properties must exhibit profitability. Because of the loss of the Joplin restaurants and the related insurance-based downturn in NOLA Ventures' overall operations, NOLA Ventures was forced to reduce its lease payments to CMH for all its leases in order to reduce its cost of business.[79]

Plaintiffs contend that CMH's sale of the property mitigated its damages, and that CMH gives Upshaw a credit for the sale when it subtracts the sale price ($112,425) from Plaintiffs' claim for "Loss of Joplin Arby's Restaurants Enterprise Value."[80] Plaintiffs additionally argue that  any amounts Lexington paid to plaintiffs cannot be used to offset the damages caused by Upshaw's wrongdoing.[81]

Finally, in response to Defendants' argument that CMH and NOLA Ventures' damages with regard to the Main Street property "offset" each other, Plaintiffs argue that CMH and NOLA Ventures are distinct entities with distinct damages. Specifically, "NOLA Ventures does not claim damages because of its failure to pay rent; CMH does."[82]

With regard to CMH's calculation of its loss of rent,

> [i]n 2010 CMH collected $1,080,103 in rental revenue from NOLA Ventures. In 2011 CMH collected only $827,482. The annual difference, $252,621 flows directly

---

[78]  *Id.* at p. 6.

[79]  *Id.* at pp. 4–5.

[80]  *Id.* at p. 9 (citing "Responses of Nola Ventures LLC, Nola Restaurant Group LLC and Critical Mass Holdings LLC to Second Set of Interrogatories and Requests for Production Propounded by Upshaw Insurance Agency, Inc. and Robert Bryan Bentley" at p. 2).

[81]  *Id.* at pp. 8–9 (citing *Prest v. Louisiana Citizens Prop. Ins. Corp.*, 12-0513, (12/4/12); So.3d, 2012 WL 6015594 at *12).

[82]  *Id.* at pp. 7–8.

to CMH's bottom line as lost cash flow. Upshaw does not dispute Dr. Boudreaux' use of an 8% cap rate. Thus the value of this annual loss to CMH if $3,157,763.[83]

## 2. NOLA Ventures' claim for settlement of Range Line lease

In response to Defendants' argument that NOLA Ventures cannot recover for the $250,000 paid to terminate the Range Line lease because the bulk of that sum was paid out of the $1.9 million received under the Lexington policy, Plaintiffs again note that "this is a separate item of damage in addition to the cost to rebuild, for which NOLA Ventures is entitled to recover."[84] Plaintiffs argue that:

> The source of funds that NOLA Ventures used to settle with University Park is irrelevant. Money is money. Lexington did not reimburse NOLA Ventures for the lease termination. But for Upshaw's negligence, NOLA Ventures would have a functioning restaurant and would not have had to pay $250,000 to University Park. However, because of Upshaw's fault, NOLA Ventures is short $250,000.[85]

Plaintiffs argue that a defendant insurance agency cannot offset amounts it owes to the insureds with settlement money from the insurance company.[86]

## 3. NOLA's loss valuation of $900,000 based on the U.S. Beef offer

In response to Defendants' argument that the U.S. Beef offer is inadmissible as an evidentiary matter and unreliable as a matter of law, Plaintiffs argue first that there is no strict rule prohibiting the use of an offer to establish business valuation.[87] Next, Plaintiffs contend that Boudreaux determined that the U.S. Beef offer was a reasonable valuation of the properties' 2011

---

[83] *Id.* at p. 5.

[84] *Id.* at p. 10.

[85] *Id.*

[86] *Id.* at p. 11 (citing *Prest v. Louisiana Citizens Prop. Ins. Corp.*, 12-0513, (12/4/12); So.3d, 2012 WL 6015594).

[87] *Id.* (citing *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 546 (5th Cir. 1974)).

value because it was the closest economic equivalent to a comparable sale and was supported by

independent data from the Missouri Department of Revenue that show "eating and drinking places"

in Joplin experienced robust increases in 2011 and 2012 compared to prior years.[88] According to

Plaintiffs, Bourdeaux determined the business valuation using two methods: (1) the U.S. Beef offer

as a "reliable fair market value" for the stores, and (2) the "free cash flow" of a business operation,

which uses earnings before interest, taxes, depreciation and amortization to calculate free cash

flow.[89] As for the reliability of the 2008 offer, Plaintiffs contend that this is a matter for cross-

examination.[90] Plaintiffs further argue that Boudreaux subtracted the $1.9 million from NOLA

Ventures' claim for the cost to reestablish the Joplin franchises:

> [B]ecause of the loss of income from the Joplin franchises, NOLA's 2011 results
> were worse than its 2010 results by amounts ranging from $445,099 to $514,127.
> Using the lower number ($445,099) and applying an industry standard multiple of
> five times earnings as a reasonable value factor for businesses like NOLA's, Dr.
> Boudreaux opines in his report that the loss of value of NOLA Ventures' business
> was $2,225,495 (5 x $445,099).[91]

### 4.       Income taxes and loan modification fee related to GE loan

According to Plaintiffs, once it was determined that rebuilding was not possible, GE

required early payment of the loan, and this loan payment was treated as income for tax purposes.[92]

Plaintiffs argue that "but for Upshaw's breach of duty, plaintiffs would have been able to rebuild

---

[88]  *Id.* at p. 12 (citing Boudreaux report at p. 6).

[89]  *Id.* at p. 13 (citing Boudreaux report at p. 6).

[90]  *Id.* at p. 14.

[91]  *Id.* at p. 15 (citing Boudreaux report at p. 13).

[92]  *Id.* at p. 16.

the Main Street restaurant, GE would not have required the early loan payments[,] and there would have been no[] tax liability."[93]

Regarding Defendants' argument that there is no evidence that the GE loan modification was caused by a lack of insurance proceeds for rebuilding, Plaintiffs point to Bievenue's deposition testimony, which, Plaintiffs allege, indicates that Plaintiffs underwent the GE loan modification in order to address the "half million dollar hole" caused by the tornado.[94] Finally, Plaintiffs aver that Defendants have produced no evidence that Plaintiffs' federal tax returns were requested or required, but that Plaintiffs have produced the tax returns filed in Missouri.[95]

### 5.    NOLA lost business value calculation of $2,225,495

Plaintiffs argue that Bourdeaux was retained to quantify and assess damages, not determine causation.[96] Plaintiffs point instead to the deposition testimony of Al Bienvenu, in which he states that a company-wide cash flow was due to (1) Plaintiffs use of both insurance and out-of-pocket funds to try to reestablish the Joplin stores, (2) the lost income from the Joplin stores, and (3) increased overhead.[97] "This cash flow 'crunch' had a domino effect on the company as a whole, which led to the $2,225,497 loss of business valuation."[98]

With respect to Bourdeaux's calculation method, Plaintiffs contend that Boudreaux "applied a five times multiple to NOLA [Ventures] earnings shortfall of $445,099, an equivalent to 20% net

---

[93] *Id.*

[94] *Id.* at p. 17 (citing Bienvenu deposition at p. 217).

[95] *Id.*

[96] *Id.* at p. 1.

[97] *Id.* at pp. 18–19 (citing Ashley deposition at p. 229, 260-261).

[98] *Id.* (citing Bienvenu affidavit).

of inflation discount rate, which is a reasonable rate for valuing such businesses and is consistent with the Real Estate Research Corporation's rates."[99]

In response to Defendants' argument that Plaintiffs are "double-dipping" because Boudreaux valued business loss of the Joplin stores at $900,000 and NOLA Ventures at $2,225,495 – and listed the two as separate damages items in his expert report – Plaintiffs contend that the two sums represent different valuations. "The first one involves only two restaurants, while the second one includes all Arby['s] restaurants owned by NOLA Ventures."[100] Moreover, Plaintiffs argue, the $2,225,495 overall business loss valuation included the $900,000 loss of the two Joplin stores.[101]

### 6. CMH's claim for lost lease values

Plaintiffs do not dispute that CMH did not own the Range Line property and cannot recover for its loss. "However, NOLA Ventures does and it has a claim for damages due to the loss of that building."[102] Plaintiffs argue that CMH had a lease for the Main Street location through 2026, as well as leases for other NOLA Ventures locations. When the Main Street store could not reopen, Plaintiffs aver, CMH had to reduce the amounts of the other NOLA Ventures leases. "The reason CMH calculates its loss thru 2026 on the other leases is because those leases also ran thru [sic] 2026."[103]

Plaintiffs dispute Defendants' argument that the Joplin stores were losing money. According to Plaintiffs,

---

[99] *Id.* (citing Boudreaux report at p. 9).

[100] *Id.* at p. 19.

[101] *Id.*

[102] *Id.* at pp. 20–21.

[103] *Id.* at p. 21.

[w]hat Upshaw seems to be refering [sic] to as proof that NOLA Ventures was losing money is NOLA's internal managerial accounting that includes an 11% management fees [sic] paid by each restaurant to NOLA Ventures. As Upshaw's expert, Steve Wood, testified, this management accounting is only a forward looking estimate for management and irrelevant for determining actual profitability."[104]

Plaintiffs reaver that CMH and NOLA Ventures are distinct corporate entities. Therefore, "CMH should not be punished simply because its members are also members of NOLA Ventures."[105] Plaintiffs further contend that only CMH claims damages for lost lease values; NOLA Ventures does not.

With respect to causation, Plaintiffs again argue that Boudreaux was retained to quantify Plaintiffs' damages, not to opine on causation. Plaintiffs again point to Bienvenu's testimony that the loss of the Joplin stores resulted in a $2,225,497 business valuation loss to NOLA Ventures.[106] Bienvenu, according to Plaintiffs, "clearly links the loss of the Joplin stores to the decision to reduce rent for all the NOLA Ventures leases."[107]

**7.    Plaintiffs' claim for loss of business opportunity in Ft. Lauderdale**

Plaintiffs adopt "Plaintiffs' Memorandum in Opposition to Motion for Partial Summary Judgment on the 'Lost Business Opportunities' Damage Claim by Defendant Lexington Insurance Company."[108] There, Plaintiffs allege that in 2011, the owners of NOLA Ventures – P. Albert

---

[104] *Id.* at p. 20.

[105] *Id.* (noting further that "its members are not the same. NOLA Ventures is owned by its members who are Paul Albert Bienvenu IV and Christopher Scott Bastion. Critical Mass Holdings, LLC is owned by Christopher Scott Bastion and Terra Firma Holdings, LLC, an LLC owned by members Paul Albert Bienvenu IV and by Mr. Bienvenu in his capacity as trustee of the PAB Trust No. 1."). *Id.*

[106] *Id.* (citing Bienvenu deposition at p. 204).

[107] *Id.* (citing Bienvenu deposition at p. 217).

[108] *Id.* at p. 21–22 (citing Rec. Doc. 87).

Bienvenu, IV and Scott Bastion – sought to purchase six additional Arby's restaurants in the Fort Lauderdale area.[109] Plaintiffs claim that Arby's Restaurant Group, Inc. prevented the sale because NOLA Ventures was in formal default as of November 7, 2011 on its royalty and advertising payments. According to Plaintiffs, this default was due to the Joplin tornados and Lexington's alleged failure to timely pay Plaintiffs' insurance claims.[110]

### 8. Axis Policy Damages

Plaintiffs state "[t]he Axis policy was worthless. Since the Lexington policy was a schedule policy instead of a blanket policy, plaintiffs were limited to the scheduled values in the Lexington policy. An 'excess' policy that will never be used was a waste of money, and plaintiffs are entitled to get it back."[111] Plaintiffs seek return of the premium they paid for the Axis policy.[112]

### 9. All other damages

With respect to Defendants' argument that since Plaintiffs did not rebuild, any claim for rebuilding costs should be disallowed as double recovery, Plaintiffs aver that they are not seeking rebuilding costs.[113] Instead, Plaintiffs argue, they are seeking damages caused by Defendants' alleged negligence and breach of fiduciary duty. Plaintiffs further aver that they are seeking damages beyond rebuilding costs, and such costs do not constitute double recovery.[114]

---

[109] Rec. Doc. 87 at p. 2.

[110] *Id.* at 2–3.

[111] Rec. Doc. 96 at p. 24.

[112] Rec. Doc. 99 at p. 5.

[113] Rec. Doc. 96 at p. 22.

[114] *Id.* (citing *Prest v. Louisiana Citizens Prop. Ins. Corp.*, 12-0513, (12/4/12); So.3d, 2012 WL 601559 at *12).

C.      *Defendants' Reply in Further Support*

In response to Plaintiffs' opposition brief, Defendants reaver that "CMH is allowing NOLA not to pay rent for Main Street. NOLA necessarily has a credit in that amount and CMH has an identical debit. This is nothing more than an accounting maneuver between two affiliated companies."[115] Defendants argue that in *Prest*, the Court "held simply that an agent could not use the insurance proceeds to offset 'additional' consequential damages, not the very damages for which the insurance had been procured. Paying off the landlord after a casualty is not a special damage. It's part of the loss."[116]

In response to Plaintiffs' argument that Bienvenu, not Boudreaux, provided causation evidence, Defendants contend that Bienvenu does not actually provide any record evidence of valuation or the U.S. Beef offer, and makes no independent valuation as an owner.[117] Moreover, "Plaintiffs cite no opposing caselaw [sic] that valuation under Louisiana law should be based on profits."[118]   Defendants additionally aver that "[n]o state or federal court has ever allowed an unaccepted offer from three years prior to the loss to be used as evidence of valuation."[119] With respect to the GE loan, Defendants argue that Plaintiffs fail to submit authority that any court has ever found payment of income taxes to be a recoverable item of damage.[120]

---

[115]  Rec. Doc. 115 at p. 2.

[116]  *Id.* at p. 4 (citing *Prest*, 2012 WL 601559 at *12).

[117]  *Id.* at p. 5.

[118]  *Id.*

[119]  *Id.*

[120]  *Id.* at p. 7.

Defendants additionally argue that Plaintiffs fail to submit evidence that GE required loan modification because of a lack of insurance proceeds for rebuilding. It is Defendants' position that Bienvenu's testimony that GE required Plaintiffs to effect the loan modification is "rank hearsay."[121] Defendants additionally argue that Plaintiffs offer "no record evidence that GE required CMH to lower the rentals."[122] Defendants reaver that Plaintiffs have not provided evidence, beyond the testimony of Bienvenu, that the company-wide cash crunch in 2011 was caused by the loss of the two Joplin stores.[123] According to Defendants,

> [Plaintiffs'] company of 29 stores had less gross revenues in 2011 than 2010. So what? Two stores closed early in 2011 and then the two Joplin stores closed in May. It is unknown if other stores were performing worse in 2011 than 2010. There is simply no summary judgment evidence to support a claim that this company-wide decrease in sales for all 29 stores was related to Joplin.[124]

Defendants further argue that Plaintiffs have failed to provide record evidence of how much, if any, of the income derived from the Joplin restaurants was being used by NOLA Ventures to pay the rent of other NOLA Ventures restaurants.[125] Finally, Defendants contend that:

> Plaintiffs ignore the express holding of the Louisiana Supreme Court and the U.S. Fifth Circuit that an insured may not recover in excess of his actual loss. It is not relevant or material if an insured has [a] blanket 'policy' or even limitless coverage. To the contrary, it is undisputed that by law, the insured is only entitled to recover the actual damages it incurred.[126]

---

[121] *Id.*

[122] *Id.* at p. 8.

[123] *Id.* at p. 7.

[124] *Id.* at p. 8.

[125] *Id.* at p. 9.

[126] *Id.*

## D.    Defendants' Supplemental Memorandum in Support

Defendants argue that Plaintiffs offer "incompetent summary judgment evidence" in their opposition to Defendants' Motion for Summary Judgment.[127] Specifically, Defendants allege that the Court should disregard the original CMH leases used to calculate the CMH lost lease values and evidence that the amended leases were oral.[128] Moreover, Defendants contend that Plaintiffs have withdrawn exhibits 96 and 105, as well as Plaintiffs' claim for the lost business opportunity in Florida.

With regard to the leases, Defendants argue that "[t]he production of the (unauthenticated) original leases as well as the production of a non-verified letter *from plaintiffs' counsel* advising that the amendments to the original leases were 'oral' is still incompetent summary judgment evidence."[129] The evidence does not fall within the FRE 1006 exception to hearsay, according to Defendants, because "a FRE 1006 summary can NEVER be based on hearsay/oral statements."[130] Defendants moreover contend that the written leases are governed by either Texas, Arizona, or Mississippi law, and that in each state "[t]he law is absolute: A lease required by law to be in writing cannot be orally modified."[131] Defendants moreover argue that any subsequent oral modification is unenforceable because the original leases state that they cannot be amended absent an express,

---

[127] Rec. Doc. 193.

[128] *Id.* at p. 3. It is unclear why Defendants consider Plaintiffs' alleged October 25, 2013 production of the original leases to be problematic.

[129] *Id.* (emphasis in original).

[130] *Id.* (emphasis in original).

[131] *Id.* at p. 3–4 (citing *Scenic Galveston, Inc. v. Infinity Outdoor, Inc.*, 151 F. Supp. 2d 812, 817 (S.D. Tex. 2001); *Thompson v. First Am. Nat'l Bank*, 19 So. 3d 784, 787 (Miss. Ct. App. 2009); *Executive Towers v. Leonard*, 439 P.2d 303, 304-05 (Ariz. Ct. App. 1968) for the proposition that if the original contract was required to be in writing, an oral amendment reducing the amount of rent was not enforceable).

unambiguous writing.[132] Defendants contend that the original leases were "require[d] by law to be in writing pursuant to multiple different statutes. Therefore the 'no oral modification' language contained in the leases is binding. Accordingly, Upshaw is entitled to summary judgment on eleven of the twelve leases."[133]

Defendants next turn to "the one Louisiana lease." If Arizona law applies to that lease, Defendants argue, then summary judgment is appropriate because, according to Defendants, Arizona law would prohibit its oral modification.[134] Under Louisiana law, Defendants contend, oral modification of an instrument involving immovable property is not binding on third parties if the lease requires all amendments to be written.[135]

Defendants again argue that Plaintiffs have failed to submit causation evidence that any loss of revenue necessitated the rental reduction that Plaintiffs claim, including through the year 2026.[136] According to Defendants, "[P]laintiffs simply attached a schedule *prepared for litigation* listing a summary of the original amount of rentals and a summary listing the amended/reduced amount of rentals, and calculated the difference through the year 2026."[137] Defendants argue that this document

---

[132] *Id.* at p. 5 (citing Rec. Doc. 193, Attachments B-M) (citing *In Re: Timely Secretarial Services, Inc.*, 987 F.2d 1167 (5th Cir. 1993)).

[133] *Id.* at p. 6.

[134] *Id.*

[135] *Id.* (citing *Davis v. Avenue Plaza LLC*, 2000-0226 (La. App. 4 Cir. 12/27/00) 778 So.2d 613; La. Civ. Code §1839).

[136] *Id.* at p. 2.

[137] *Id.* (citing Rec. Doc. 99–9).

is "incompetent summary judgment evidence" because it was not authenticated and "was prepared in anticipation for litigation and is therefore hearsay."[138]

Defendants next argue that Plaintiffs submit only Exhibit G and Exhibit H to the affidavit of Bienvenu, and that neither exhibit is "competent summary evidence" of the NOLA Ventures Loss Business Value because (1) they were not authenticated by Bienvenu in his affidavit, and (2) "they are schedules prepared for litigation."[139] As such, according to Defendants, both exhibits are "rank hearsay."[140] Moreover, Defendants argue that Exhibits G and H to Bienvenu's affidavit are the same documents as Exhibits 96 and 105, which Plaintiffs withdrew from trial on October 25, 2013.[141] According to Plaintiffs, "[t]his Honorable [C]ourt cannot rely on [Rec. Docs.] 99-7 and 99-8, as they are unauthenticated hearsay non-business record documents prepared for litigation, and plaintiffs have now withdrawn them from trial."[142] Finally, Defendants contend that Plaintiffs have withdrawn their claim for damages regarding Plaintiffs' alleged lost Ft. Lauderdale business opportunity.[143]

### E. *Plaintiffs' Sur-Reply Memorandum in further Opposition*

In further opposition to Defendants' motion, Plaintiffs argue that their "Sur-Reply Memorandum in Opposition to Defendants' Motions in Limine to Exclude Certain of Plaintiffs'

---

[138] *Id.*

[139] *Id.* at p. 7–8 (citing Rec. Doc. 96).

[140] *Id.* at p. 8.

[141] *Id.* (citing Rec. Doc. 99–7, 99–8). Defendants fail to cite record document numbers for where plaintiffs allegedly "withdrew" Exhibits 95 and 105 from the record.

[142] *Id.* at p. 9.

[143] *Id.* at p. 9–10.

Exhibits" contains CMH's rent records for all properties leased to NOLA Ventures covering all periods relevant to this litigation.[144] According to Plaintiffs, "[t]he rent records contained in Exhibit 57 reflect that a reduction in rent occurred between January 2012 and February 2012, mere months after the tornado loss and the defendants' breach."[145] Plaintiffs further aver that they provided a summary of that information because CMH's rent records are voluminous and require calculations to determine the rental amounts lost.[146] Moreover, Plaintiffs argue that they provided these records to Defendants "well in advance of trial on October 11, 2013."[147]

Plaintiffs reaver that the Defendants, as strangers to the lease, are precluded from asserting the statute of frauds to shield themselves from liability, regardless of whether Texas, Mississippi, Louisiana, Arizona, or Missouri law governs.[148] Finally, Plaintiffs state that all leases between CMH and NOLA Ventures contain a provision that they cannot be amended absent an express, unambiguous writing. Plaintiffs contend, however, that lease provisions proscribing oral modifications are generally not enforced under the laws of the states that govern these leases.[149]

---

[144] Rec. Doc. 219 at p. 2–3 (citing Rec. Doc. 205 at p. 4–6).

[145] *Id.* at p. 3.

[146] *Id.*

[147] *Id.*

[148] *Id.* at p. 4. (citing *Davis v. Freeman*, 371 S.W.2d 650, 654-55 (Tex. Civ. App. 1961); *Davis v. Stegall*, 151 So.2d 813, 815 (Miss. Ct. App. 1963); *Brought v. Howard*, 249 P. 76, 80 (Ariz. 1926); *Scott v. Ranch Roy-L, Inc.*, 182 S.W.3d 627, 634 (Mo. Ct. App. 2005)). Plaintiffs do not cite a Louisiana case to support their argument.

[149] *Id.* at p. 7 (citing *Am. Garmet Properties, Inc. v. CB Richard Ellis-El Paso, LLC*, 155 S.W.3d 431, 435 (Tex. App. 2004); *Eastline Corp. v. Marion Apartments, Ltd.*, 524 So.2d 582, 584 (Miss. 1988); *Karno v. Joseph Fein Caterer, Inc.*, 2002-1269 (La. App. 4 Cir. 4/16/03), 846 So.2d 105, 108; *O'Malley Inv. & Realty Co. v. Trimble*, 422 P.2d 740, 747 (1967); *Rufkahr Const. Co. v. Weber*, 658 S.W.2d 489, 498 (Mo. Ct. App. 1983)).

### III. Standard on a Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[150] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[151] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[152] If the record, as a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law."[153] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[154]

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[155] Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[156]  To withstand a motion for summary judgment, a plaintiff must show that there is a

---

[150] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[151] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[152] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[153] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[154] *See, e.g.*, *Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[155] *Celotex*, 477 U.S. at 323.

[156] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.1994), cert. denied, 513 U.S. 871 (1994).

genuine issue for trial by presenting evidence of specific facts.[157]  The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied  merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence ."[158] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party.[159]

## IV. Law and Analysis

### A.    Applicable Law

This Court's subject matter jurisdiction was invoked pursuant to 28 U.S.C. § 1332, which provides original jurisdiction over civil actions between citizens of different states where the matter in controversy exceeds $75,000. As a federal court exercising diversity jurisdiction, it is "axiomatic" that this Court must apply Louisiana law to resolve matters of substantive law presented in the pending motion and "attempt to discern how Louisiana's highest court would resolve the issues at hand."[160] Although that doctrine is equally applicable when a federal court is "[a]ddressing an unsettled area of Louisiana law," federal courts should "avoid creating new rights and remedies in Louisiana state law where [the court] lack[s] express statutory authority or clear directive from the Louisiana Supreme Court."[161]

---

[157]  *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012), citing *Anderson*, 477 U.S. 242 at 248-49.

[158]  *Little*, 37 F.3d at 1075.

[159]  *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002).

[160]  *In re Whitaker Const. Co. Inc.*, 411 F.3d 209, 209 n.4 (5th Cir. 2005) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[161]  *Id.*

### B.    Analysis

#### 1.    CMH's claim for lost rent of the Main Street Property in the amount of $626,025

Defendants claim that CMH is not entitled to lost future rent of the Main Street property because CMH has already received $383,760.25 in insurance proceeds. Plaintiffs argue that CMH's claim for lost rental income is in addition to the amount for building damage ultimately paid under the Lexington policy.[162] The Court finds Defendants' argument unpersuasive in light of the collateral source rule.

The collateral source rule is a rule of evidence and damages that is of common law origin, yet embraced and applied by Louisiana courts. Under the collateral source rule, "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution."[163] The Louisiana Supreme Court explained in *Bozeman v. State* that "the payments received from the independent source are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer, and, a tortfeasor's liability to an injured plaintiff should be the same, regardless of whether or not the plaintiff had the foresight to obtain insurance."[164] In *Prest v. Louisiana Citizens Prop. Ins. Corp.*, a case upon which Plaintiffs rely, the Louisiana Supreme Court held that, under the collateral source rule, the Plaintiffs' recovery of insurance proceeds did not shield their insurance agent from the payment of damages for its negligence in failing to obtain requested insurance

---

[162] Rec. Doc. 70–3 at p. 7. Specifically, Plaintiffs contend that Defendants owe CMH the difference between the lease value of $738,450 (representing the entirety of the NOLA lease) and the land's sale price of $112,425. *Id.*

[163] *Prest v. Louisiana Citizens Prop. Ins. Corp.*, 2012-0513 (La. 12/4/12), 125 So. 3d 1079, 1088 (citations omitted).

[164] *Bozeman v. State*, 2003-1016 (La. 7/2/04), 879 So. 2d 692, 698 (citations omitted).

coverage or to inform Plaintiffs that they were not actually covered by the amount of insurance they requested. The Court accordingly finds that Defendants' argument is unpersuasive.

Defendants' argument that CMH cannot claim future lost rentals as a matter of law because it never placed NOLA in default or provided NOLA with a written notice of termination is similarly unpersuasive.[165] Plaintiffs do not dispute that the contract between CMH and NOLA Ventures included a clause requiring CMH to provide a written notice of termination to NOLA Ventures. Rather, Plaintiffs argue that there was a tacit agreement that written notice was unnecessary given the total loss of the properties, and that as a matter of law, Defendants cannot use a contract to which it is not a party to shield it from liability.[166]

Under Louisiana law, a court may not consider parol evidence to alter the terms of a written agreement when that agreement is a complete and accurate statement of all the terms agreed upon by the parties.[167] However, a court may, "in the interest of justice," consider testimonial evidence "to prove that the written act was modified by a subsequent and valid oral agreement."[168] Even a written merger or integration clause is not a *per se* bar on consideration of parol evidence.[169] Modification can be presumed by silence, inaction, or implication.[170] It is a question of fact as to

---

[165] Rec. Doc. 72–3 at p. 2–3

[166] Rec. Doc. 96 at p. 6.

[167] *King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 719 (5th Cir. 2011) (citing La Civ.Code Ann. art. 1848

[168] *Id.* (citing La Civ.Code Ann. art. 1848).

[169] *Id.* (*citing Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316, 1328 (5th Cir.1994)).

[170] *Kennedy Marr Offshore Singapore Pte Ltd. v. Techcrane Int'l Inc,* No. 12-1985, 2013 WL 3283343 (E.D. La. June 27, 2013), *appeal dismissed* (Feb. 4, 2014) (Affrick, J.).

whether there were oral agreements that modified the written contract.[171] Accordingly, Defendants' argument fails as a matter of law.

Defendants next argue that CMH and NOLA Ventures' damages "offset" each other because any rent that CMH has been unable to collect is rent that NOLA Ventures did not have to pay. Plaintiffs respond that CMH and NOLA Ventures are distinct entities; namely, that NOLA Ventures is owned by Bienvenu and Bastion; CMH is owned by Bastion and Terra Firma Holdings, LLC; and Terra Firma Holdings is owned by Bienvenu, individually and in his capacity as trustee of the PAB Trust No. 1.[172] Neither party cites legal authority for their arguments. "[U]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment."[173] Accordingly, summary judgment as to CMH's claim for lost rent of the Main Street property is DENIED.

## 2. NOLA's settlement of Range Line Lease in the amount of $250,000

According to Boudreaux, NOLA Ventures paid $250,000 to the owner of the Range Line property to settle the lease on that property. Defendants argue that summary judgment as to this damage item is appropriate because there is no evidence that the entire sum was not paid out of the $1.9 million insurance proceeds received by NOLA Ventures. Plaintiffs argue that the source of these funds is irrelevant because the $1.9 million payment was intended to reimburse NOLA

---

[171] *Id.* (citing *Pelican Elec. Contractors v. Neumeyer,* 419 So.2d 1, 5 (La. Ct. App. 4 Cir. 1982)).

[172] Rec. Doc. 96 at p. 21.

[173] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quotation marks omitted); *Little*, 37 F.3d at 1075.

Ventures for rebuilding, not for the lease termination.[174] For the reasons stated above with regard to the collateral source rule, summary judgment on this damage item is DENIED.

### 3.     NOLA's loss valuation of $900,000 based on the U.S. Beef offer

Defendants argue that Boudreaux erred in valuing the Joplin properties based on the 2008 U.S. Beef offer because (1) evidence of an offer to purchase is inadmissible and unreliable as a matter of law and (2) under Louisiana law, the proper measure of valuation must be performed at the time the business was destroyed and based on profits. Plaintiffs argue that (1) there is no strict rule prohibiting use of an offer to establish business valuation and (2) Boudreaux's valuation calculation was valid.

Relying on *United States v. Smith*, Defendants argue that evidence of an offer to purchase is inadmissible to establish market value.[175] It is Defendants' position that an offer for a sale that did not take place is unreliable without evidence as to why the sale did not go through. However, the holding in *Smith* resulted because the expert witness failed to base his market valuation on comparable sales, *and* because he failed to articulate any basis other than that for his opinion.[176] *Smith* held that the testimony of an expert witness on market valuation is admissible as evidence, provided that the witness state the assumptions on which his or her opinion is based.

Defendants additionally argue that under Louisiana law, a valuation must be performed at the time the business was destroyed. In *Achee v. Nat'l Tea Co.*, a case upon which Defendants rely, the First Circuit Court of Appeals of Louisiana defined "business destruction" as "a business that

---

[174] *Id.* at p. 10.

[175] *United States v. Smith*, 355 F.2d 807, 809 (5th Cir. 1966).

[176] *Id.*

is, in effect, put out of existence," and held that the proper measure of damages for a business destruction claim is the loss of value of the business at the time of the destruction.[177] However, the court also recognized that:

> Business valuations methods are not exact and are basically guides for buyers and sellers to use in an effort to determine what would be the fair market value for a given business. Given the dynamics of businesses and business practices, and factoring in circumstance that may be unique to the parties, an inflexible formula for determining loss of value would be impracticable.[178]

Plaintiffs present evidence in the record – namely, Boudreaux's report – that the valuation of the Joplin properties was calculated two ways: by using the U.S. Beef offer as a "reliable fair market value" for the stores, and by analyzing the "free cash flow" of a business operation, which uses earnings before interest, taxes, depreciation and amortization to calculate free cash flow."[179] Boudreaux determined that the U.S. Beef Offer was a reasonable valuation of the Joplin properties' 2011 value because it was the closest economic equivalent to a comparable sale and was supported by independent data from the Missouri Department of Revenue that show "eating and drinking places" in Joplin experienced robust increases in 2011 and 2012 compared to prior years.[180]

The Court concludes that Defendant's criticism of Boudreaux's choice of data and assumptions underlying his opinion go to the weight of his testimony and not to its admissibility. This is not the kind of case in which "the universe of facts assumed by the expert differs frequently

---

[177] *Achee v. Nat'l Tea Co.*, 95-2556 (La. App. 1 Cir. 12/20/96), 686 So. 2d 121.

[178] *Id.* at 125.

[179] Rec. Doc. 96 at p. 13 (citing Boudreaux report at p. 6).

[180] *Id.* at p. 12 (citing Boudreaux report at p. 6).

and substantially from the undisputed record evidence."[181] Rather, it is the kind of situation in which "reliable expert testimony . . . involves estimation and reasonable inferences from a sometimes incomplete record."[182] Any alleged shakiness of Boudreaux's opinion is properly the subject of cross-examination and contradictory evidence.[183] Accordingly, Defendants' Motion for Summary Judgment as to this damages item is DENIED.

### 4. Income taxes and loan modification fee related to GE Loan

Defendants argue that Plaintiffs have not shown that the income tax consequences and loan modification fee incurred by early repayment of the GE loan resulted from the destruction of the Joplin properties. As a threshold issue, Defendants argue that income tax is not a damage. Howeover, under Louisiana Civil Code article 2315, a tortfeasor must compensate a tort victim for all of the damages occasioned by his act. The term "damages" refers to "pecuniary compensation, recompense, or satisfaction for an injury sustained."[184] The Court accordingly finds that tax consequences allegedly incurred as the result of a tort may constitute a damage.

Plaintiffs point to Bievenue's deposition testimony, which, they allege, indicates that Plaintiffs underwent the GE loan modification in order to address the "half million dollar hole" caused by the tornado.[185] Specifically, Bienevnue testified that:

---

[181] *Moore,* 547 F. App'x at 516.

[182] *Id.*

[183] *Arnold v. Canal Barge Co.*, No. 13-4966, 2014 WL 2465313 (E.D. La. June 2, 2014).

[184] *Willis v. Noble Drilling (US), Inc.*, No. 11–598 (La. App. 5 Cir. 11/13/12), 105 So.3d 828, 843, *citing Fogle v. Feazel,* 10 So.2d 695, 698 (1942).

[185] Rec. Doc. 96 at p. 157 (citing Bienvenu deposition at p. 217).

Because the stores – or the tornado set what I'd say a chain reaction into play that wasn't covered by –or either wasn't covered or we didn't receive the funds that we thought we'd get from Lexington as a result of what we thought we were getting from –from Joplin. My belief is that had we gotten – not from Joplin, from Upshaw. Had we gotten what we thought we had, we would have been fine, we would have had a short cash flow issue for a handful of months that would have rebounded and we would have been fine. Instead what happened is, we didn't have the coverage that we thought we had, which caused our short term cash flow problem and turned it into a long term cash flow problem. And that's why there's the damage claim.[186]

Plaintiffs additionally proffer Boudreaux's expert report, in which he states that "[b]ecause of the cessation of operations in Joplin, plaintiffs' GE financing required that plaintiffs use $383,700 of its insurance proceeds to pay-down its GE loan."[187] The Court finds that Plaintiffs have proffered sufficient evidence to survive summary judgment as to this damage item. Accordingly, summary judgment is DENIED as to the income tax consequences and loan modification fee related to early repayment of the GE loan.

### 5.    NOLA lost business value calculation of $2,225,495

Defendants argue that Boudreaux erred when he derived a valuation loss of $2,225,495 by comparing company-wide sales in 2010 to company-wide sales in 2011.[188] Specifically, Defendants aver that Boudreaux conceded that he did not know if the decrease in sales in 2011 was actually caused by the loss of the Joplin stores, and was unaware that the Slidell and LaPlace stores closed in early 2011.[189] Plaintiffs argue that Boudreaux's company-wide comparison is appropriate because

---

[186] Bienvenu deposition at p. 206–07.

[187] Rec. Doc. 70–3 at p. 8.

[188] *Id.* at p. 12.

[189] *Id.* (citing Boudreaux deposition at p. 110–111; 51).

"[s]imply looking at individual[] stores would not account for issues relating to the company as a whole."[190]

The Court concludes that Defendant's criticism of Boudreaux's choice of data and assumptions underlying his opinion go to the weight of his testimony and not to its admissibility. This is not the kind of case in which "the universe of facts assumed by the expert differs frequently and substantially from the undisputed record evidence."[191] Rather, it is the kind of situation in which "reliable expert testimony ... involves estimation and reasonable inferences from a sometimes incomplete record."[192] Any alleged shakiness of Boudreaux's opinion is properly the subject of cross-examination and contradictory evidence.[193]

Defendants additionally argue that Plaintiffs are "double-dipping" because Boudreaux contends that NOLA has incurred losses of $900,000 for the Joplin properties and $2,225,495 overall, including the Joplin figures. Boudreaux's summary of his assessment of Plaintiffs' damages includes both "NOLA's Loss of Joplin Arby's Business Value" for $900,000 and "NOLA's Lost Business Value" for $2,225,495.[194] Boudreaux states that:

> This [$2,225,495] figure of course includes the effect of NOLA's loss of the ongoing Joplin business value, cited above as $900,000. At this writing I am not expressing an opinion as to the interaction of these two lost valuation figures (which would at least require NOLA data beyond 2011 and perhaps for several years). Mr. Bienvenu

---

[190] Rec. Doc. 96 at p. 18.

[191] *Moore,* 547 F. App'x at 516.

[192] *Id.*

[193] *Arnold v. Canal Barge Co.*, 13-4966, 2014 WL 2465313 (E.D. La. June 2, 2014).

[194] Rec. Doc. 70–3 at p. 13.

or another representative of NOLA may be capable of refining that interaction for the trier of fact.[195]

Plaintiffs contend that the $2,225,495 overall business loss valuation included the $900,000 loss of the two Joplin stores.[196] The Court consequently understands Plaintiffs' position to be that the $2,225,495 overall figure includes the $900,000 sum for the two Joplin properties, and that Boudreaux's damages summary is mistaken insofar as it lists "NOLA's Loss of Joplin Arby's Business Value" and "NOLA's Lost Business Value separately.[197] However, summary judgment regarding Boudreaux's methodology in calculating the $2,225,495 figure is premature because, as stated above, this is a matter for cross-examination. Summary judgment as to this damages item is DENIED.

### 6. CMH's claim for lost lease values

Plaintiffs seek damages allegedly caused when GE required CMH to reduce the rent of the other NOLA Ventures leases - which extend to 2026 – so that those properties would be profitable.[198] Boudreaux calculated that over the life of these leases, CMH lost $3,157,763. Defendants argue that summary judgment is appropriate because (1) Plaintiffs have not proven that the loss of the Joplin properties caused the other NOLA Ventures properties to become unprofitable so that CMH had to reduce their rental payments; (2) "this is not true damage" because the members

---

[195] *Id.* at p. 9.

[196] *Id;* Rec. Doc. 96 at p. 19.

[197] Rec. Doc. 70–3 at p. 13.

[198] The Parties do not appear to dispute that CMH did not own the Range Line property and therefore cannot recover for its loss.

of NOLA Ventures and CMH are "congruent;" and (3) Plaintiffs proffer insufficient evidences of the written leases and oral amendments to the written leases.[199]

Plaintiffs have proffered testimony by Bienvenu that the loss of the Joplin properties effected the other NOLA Ventures stores, and that the Joplin stores contributed to the income of NOLA Ventures.[200] Plaintiffs further point to Boudreaux's report, which states that

> In 2010 CMH collected $1,080,103 in rental revenue from NOLA [Ventures]; in 2011 CMH collected only $827,482 of such revenues. The annual difference, $252,621 flows directly to CMH's bottom line as lost cash flow. Using the 8% cap rate[,] the value of this annual loss to CMH is $3,157,763.[201]

The Court finds that there is a material issue of fact regarding whether the loss of the Joplin properties caused the other NOLA Ventures properties to become unprofitable, and that Plaintiffs have proffered sufficient evidence that NOLA Ventures and CMH are different entities.[202] With regard to evidence of CMH's leases with other NOLA Ventures properties, Plaintiffs point to "CMH Rent Record 2009-2013"[203] which, Plaintiffs contend, contains rent records for all properties leased to NOLA Ventures covering all periods relevant to this litigation.[204] Accordingly, summary judgment as to this damages item is DENIED.

---

[199] Rec. Doc. 72–3 at p. 15, 17.

[200] Rec. Doc. 96 at p. 19 (citing Bienvenu deposition at p. 207).

[201] Rec. Doc. 70–3 at p. 10.

[202] Rec. Doc. 96. at p. 5.

[203] Rec. Doc. 219 at p. 1.

[204] *Id*. at p. 3.

## 7. NOLA Ventures' alleged lost business opportunity in Ft. Lauderdale

In their motion, Defendants argue that the alleged business opportunity in Ft. Lauderdale was speculative and a "non-starter prior to the Joplin tornado, due to previous defaults by NOLA [Ventures]."[205] Plaintiffs then argued that Arby's Restaurant Group, Inc. prevented the sale because NOLA Ventures was in formal default as of November 7, 2011 on its royalty and advertising payments, and that the default was due to the Joplin tornados.[206] In their supplemental memorandum in support of the motion for summary judgment, Defendants contend that "[a]t an exhibit exchange held in this matter on October 14, 2013, counsel for plaintiffs advised that they were no longer pursuing this item of damages."[207] In their sur-reply, Plaintiffs do not address this contention, or make further reference to the alleged business opportunities. The Court finds that Plaintiffs have failed to proffer sufficient evidence of a genuine issue of fact on this issue, and accordingly the Court GRANTS partial summary judgment as to this damages item.

## 8. Axis Policy Damages

Defendants contend that Plaintiffs have no cause of action with regard to the Axis policy because "[i]t is undisputed that the excess policy would never be triggered even if plaintiffs were entitled to all insurance proceeds they are claiming herein."[208] Plaintiffs state that "[t]he Axis policy was worthless. Since the Lexington policy was a schedule policy instead of a blanket policy, plaintiffs were limited to the scheduled values in the Lexington policy. An 'excess' policy that will

---

[205] Rec. Doc. 72–3 at p. 19.

[206] Rec. Doc. 87 at p. 2–3.

[207] Rec. Doc. 193 at p. 9–10.

[208] Rec. Doc. 72–3 at p. 23–24.

never be used was a waste of money, and plaintiffs are entitled to get it back."[209] The Court finds

that there is a genuine issue of fact regarding whether Defendants misrepresented that the Lexington

policy would provide blanket coverage.[210] Accordingly, the Court DENIES summary judgment as

to the Axis policy damages.

### 9.    All other damages

Defendants seek summary judgment all other damages claims. Defendants argue that since

Plaintiffs did not rebuild either Joplin location – they settled the lease with the landlord for one

location and sold the other – any claim for rebuilding costs should be disallowed as double recovery

under Louisiana law.[211] Plaintiffs aver that they are not seeking rebuilding costs.[212] Instead, Plaintiffs

argue, they are seeking damages caused by Defendants' alleged negligence and breach of fiduciary

duty. For the reasons stated above regarding the collateral source rule, summary judgment as to all

other damages is DENIED.

### V. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment on the Issue

---

[209] *Id.* at p. 24.

[210] *See* Rec. Doc. 229.

[211] Rec. Doc. 72–3 at p. 20 (citing *Bradley v. Allstate Ins. Co.*, 620 F.3e 509 (5th Cir. 2010).

[212] *Id.* at p. 22.

of Damages arising out of NOLA Ventures' alleged lost business opportunity in Ft. Lauderdale is **GRANTED**.

 **IT IS FURTHER ORDERED** that as to (1) CMS's claim for loss of future rent of the Main Street property in the amount of $626,0253; (2) NOLA Ventures' settlement of the Range Line lease for $250,000; (3) NOLA Ventures' loss  valuation of $900,000; (4) Plaintiffs' income taxes of $383,700 and loan modification fee of $45,000 related to its loan from GE (the "GE loan"); (5) NOLA Ventures' lost business value calculation of $2,225,495; (6) CMH's lost lease values; (8) "Worthless Axis Policy" damages; and (9) all other damages claims, Defendants' Motion for Summary Judgment is **DENIED**.

 **NEW ORLEANS, LOUISIANA**, this  22nd day of September, 2014.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**